SCHROEDER v TERRA ENERGY, LIMITED

Docket No. 184132. Submitted December 4, 1996, at Grand Rapids. Decided April 25, 1997, at 9:00 A.M. Leave to appeal sought.

Theodore P., Karl M., and Jennifer J. Schroeder brought an action in the Otsego Circuit Court against Terra Energy, Limited, seeking damages for the defendant's alleged breach of certain agreements relating to an oil and gas lease of the plaintiffs' natural gas rights associated with real property. The agreements, in part, provided that the defendant agreed to pay the plaintiffs a certain percentage of "the gross proceeds at the wellhead" payable "at the prevailing market rate at the wellhead." The plaintiffs contended that the defendant breached the agreements when, following its initial payments to the plaintiffs without deducting postproduction costs from the gross proceeds, the defendant began deducting postproduction costs associated with making the natural gas marketable after it is removed from the ground. The plaintiffs also alleged that the defendant breached its duty under the contract by failing to obtain the "best available market price" and by failing to obtain an assignment of certain contract rights of the defendant's predecessor/subsidiary, Energy Reserves, Inc., with regard to a contract between Energy Reserves and Michigan Consolidated Gas Company. The court, Alton T. Davis, J., granted summary disposition for the defendant and awarded the defendant costs and attorney fees as sanctions against the plaintiffs for filing a frivolous complaint. The plaintiffs appealed.

The Court of Appeals held:

1. The trial court correctly held that the plaintiffs were required by the contract to bear the proportionate burden of the postproduction costs. That part of the court's order must be affirmed.

2. The language used by the parties "gross proceeds at the wellhead" fairly contemplates the deduction of postproduction costs from the sales price of the gas.

3. Because the plaintiffs did not materially change their position in detrimental reliance on the defendant's original course of performance of not deducting postproduction costs, the defendant is not estopped from recognizing its mistake and correcting it.

4. The plaintiffs did not raise their collateral estoppel argument in the trial court, therefore they may not raise it on appeal.

5. The plaintiffs' claim of breach of contract regarding the defendant's failure to obtain the contract rate applicable to the contract between Energy Reserves and Michigan Consolidated Gas Company should not have been dismissed. The matter must be remanded with regard to this issue to determine whether the defendant breached the agreement by improperly releasing Michigan Consolidated Gas Company from having to buy the plaintiffs' gas or by not negotiating with sufficient vigor for an assignment of the gas.

6. The trial court properly ruled that the contract did not require the defendant to obtain the best available market rate.

7. The trial court improperly sanctioned the plaintiffs for filing a frivolous complaint. The trial court erred in finding that the plaintiffs' claim was frivolous. The award of sanctions and costs must be reversed.

Affirmed in part, reversed in part, and remanded.

1. CONTRACTS — JUDICIAL CONSTRUCTION — OIL AND GAS LEASES.

The general precept of contact law that a contract is construed against the party responsible for drafting a disputed provision applies to oil and gas leases and requires that the terms of the contract be construed for the benefit of the lessor and against the lessee; because form gas and oil leases can be modified to clarify understandings or meanings, the rule by which such leases are construed for the benefit of the lessor and against the lessee should not be relaxed when the lessee has opted to rest on ambiguity.

2. GAS AND OIL — CONTRACTS — POSTPRODUCTION COSTS — WORDS AND PHRASES — GROSS PROCEEDS AT THE WELLHEAD.

The term "gross proceeds at the wellhead" contained in a form gas lease agreement wherein the lessor is to be paid a certain percentage of the gross proceeds at the wellhead fairly contemplates the lessee's deduction of postproduction costs from the sale price of the gas in determining the amount of royalties due the lessor where there is no actual sale of the gas at the wellhead resulting in ascertainable gross proceeds and the sale occurs after the gas has been transported to the point of sale and processed.

3. GAS AND OIL — CONTRACTS — POSTPRODUCTION COSTS.

Gas royalty is ordinarily payable in money rather than in kind and is measured by value or proceeds at the wellhead; therefore, it is not customary, as in the case of the oil royalty paid in kind, to specify

in a gas lease agreement that the royalty is free of the cost of production.

4. CONTRACTS — INTERPRETATION — PARTIES' COURSE OF PERFORMANCE — ESTOPPEL.

The course of performance of a contract by a party generally is highly persuasive evidence of the proper interpretation of the contract when introduced against the party so performing; nevertheless, the law recognizes that a party may undertake a wrong interpretation of the words of a contract and the other party should not be permitted to profit by such mistake in the absence of an estoppel arising from a prejudicial change of position in good-faith reliance on such performance.

5. GAS AND OIL — CONTRACTS — ROYALTIES — WORDS AND PHRASES — PREVAILING MARKET RATE — BEST AVAILABLE MARKET PRICE.

A gas lease that provides that the lessee pay the lessor a royalty of a certain percent of the proceeds, payable monthly at the prevailing market rate at the wellhead, does not necessarily require the lessee to obtain the best available market price.

*H. Keith DuBois*, for the plaintiffs.

*Joel R. Myler, P.C.* (by *Joel R. Myler*), and *Loomis, Ewert, Parsley, Davis & Gotting, P.C.* (by *James R. Neal* and *Michael H. Rhodes*), for the defendant.

Amici Curiae:

*Stead & Heath, P.C.* (by *Robin Stead* and *Donald F. Heath, Jr.*), for National Association of Royalty Owners, Inc.

*Rosi Law Offices, P.C.* (by *Philip R. Rosi*), and *Julie A. Harrison*, for Antrim Mineral Owners Association.

Before: SAWYER, P.J., and MARKMAN and H. A. KOSELKA*, JJ.

---

* Circuit judge, sitting on the Court of Appeals by assignment.

MARKMAN, J. Plaintiffs appeal as of right from an order granting summary disposition in favor of defendant pursuant to MCR 2.116(C)(8) and awarding defendant costs as sanctions against plaintiffs. We affirm in part, reverse in part, and remand.

Plaintiffs own natural gas rights associated with real property located in Charlton Township, Otsego County. Plaintiffs and defendant entered into an oil and gas lease agreement and a "letter" agreement on May 29, 1991. On July 11, 1991, plaintiffs and defendant entered into a surface use agreement. Together the three agreements (hereafter agreement) allowed defendant to mine and explore for oil and gas on plaintiffs' property. The agreement also allowed defendant to operate oil and gas wells and lay pipe across the property for transportation of the oil or gas. In return for these privileges, defendant agreed to pay plaintiffs "one-eighth (1/8) [later changed by the parties to 19.375 percent] of the gross proceeds at the wellhead, payable monthly for the gas from each well where gas is found, while the same is being used off the premises."[1] Defendant also agreed to pay plaintiffs "for gas produced from any oil well and used off the premises or in the manufacture of gasoline or any other product a royalty of [19.375 percent] of the proceeds, payable monthly at the prevailing market rate at the wellhead."

Plaintiffs filed a complaint alleging that until April 20, 1993, defendant paid them 19.375 percent of the gross proceeds without deducting postproduction

---

[1] The term "wellhead" generally refers to the point at which gas is severed or removed from the ground.

costs.[2] However, by letter dated April 20, 1993, defendant advised plaintiff Theodore Schroeder that it would deduct postproduction costs in the future and would also reduce plaintiffs' future revenues to recoup past overpayments. Plaintiffs contended that, by reducing their payments, defendant breached a material provision of their contract. In their second amended complaint, plaintiffs further alleged that defendant's predecessor/subsidiary, Energy Reserves, Inc., had contracted with Michigan Consolidated Gas Company (Michcon) to sell gas at the rate of $3.15142 per Mcf until December 31, 1996. Plaintiffs asserted that, by letter dated February 24, 1992, defendant wrongly warranted to Michcon that " 'Antrim production from' the subject premises 'will never subject Michcon to any duty to purchase gas pursuant to said gas contract.' " Plaintiffs alleged that defendant thereby breached its duty under the contract by failing to obtain the "best available market price" and by failing to obtain assignment of the Michcon contract.

The trial court held that the designation of the wellhead as the place for calculation of the royalty payment subjected plaintiffs to the deduction of downstream postproduction costs of marketing the gas. The court further held that this principle was "so firmly established in Michigan oil and gas jurisprudence that plaintiffs' argument, that the assessment of these costs approximately ten months after first production is indicative of a contrary agreement, is wholly unpersuasive." The court also held that defendant was obligated to sell the gas at the prevail-

---

[2] The term "postproduction costs" refers to costs associated with making the natural gas marketable after the gas is severed or removed from the ground.

ing market rate and not at the best available price. Finally, the court sanctioned plaintiffs for filing a frivolous complaint and awarded defendant costs and attorney fees.

Plaintiffs first argue that the trial court incorrectly held that they were required by the contract to bear the proportionate burden of postproduction costs. We conclude that the trial court reached the correct result with regard to this issue and accordingly that appellate relief regarding this aspect of the case is unwarranted.

The principal issue in this case is whether the language "gross proceeds at the wellhead" used in the agreement fairly contemplates the deduction of postproduction costs from the sales price of the gas.[3] This is an issue of first impression in Michigan. There is apparent difficulty in practical application of the contractual phrase "gross proceeds at the wellhead," in that natural gas is not typically sold at the wellhead and thus has no readily determinable price at that point from or in relation to which gross proceeds may be determined. The gas is normally sold by producers or pipeline companies only after it has been processed and transported to the "market."

Both parties use various principles of contract interpretation to support their interpretation of the contractual language at issue. Defendant urges this

---

[3] The issue can also be put in terms of *where* the gas is to be valued for purposes of determining plaintiffs' royalty payments. Defendant urges that the valuation occur at the wellhead and that, given the absence of any market at the wellhead itself, such valuation must take into consideration the postproduction costs necessary to prepare the gas for its ultimate market. Plaintiffs urge that the valuation occur where the market for the gas exists and that, at this point, there is no need to reduce the sales price by postproduction costs.

Court to interpret the language in a manner requiring plaintiffs to pay a proportionate share of postproduction costs by arguing that industry usage of the language and custom mandates such a result.

Plaintiffs and amici curiae counter that the language does not require plaintiffs to pay any portion of the postproduction costs. First, they argue that, because defendant had paid the postproduction costs from the time the contract was executed until April 20, 1993, such conduct was evidence of how the language should be interpreted. Second, they argue that within the contract there is an implied duty to market the gas and that this duty necessarily includes bearing the costs of making the gas salable. Finally, they argue that any ambiguities in the language should be resolved in favor of the lessors because the lessees, being familiar with trade and industry practice, are the more knowledgeable party and would otherwise be in a position to take advantage of the lessors.

Generally, contractual language is interpreted according to the plain meaning of the language in the contract rather than a technical construction of the language. *G&A Inc v Nahra*, 204 Mich App 329, 330-331; 514 NW2d 255 (1994). However, in *Michigan Wisconsin Pipeline Co v Michigan Nat'l Bank*, 118 Mich App 74, 80-81; 324 NW2d 541 (1982), the Court held:

> In construing an oil and gas lease, this Court is guided by the Supreme Court's decision in *J J Fagan & Co v Burns*, 247 Mich 674; 226 NW 653; 67 ALR 522 (1929). In *J J Fagan*, the Court noted the widespread use of standard oil and gas lease forms. The Court further noted that the language used ˙in those lease forms had evolved through the process of trial and error with careful attention being paid to judicial decisions interpreting the standard contractual verbiage. An

> oil and gas lease is not an isolated agreement drafted by
> uninformed neighbors to express roughly their agreement
> but, rather, is a technical contract reflecting the develop-
> ment and present status of the law of oil and gas. *Id.*, 678.
> Such a lease, the Court concluded, should be read "not only
> according to its words, but in connection with the purpose
> of its clauses." *Id.*, 678. See, also, *Howard v Hughes*, 294
> Mich 533; 293 NW 740 (1940).

However, these precedents do not stand for the proposition that any usage of trade in the oil and gas industry necessarily controls the interpretation of this contract. A general principle of contract law is that, even where such usage or custom is well established, it is not controlling if only one party meant the usage or custom to be operative and the other party had no reason to know of this interpretation. 3 Corbin, Contracts, § 555, p 238. The law imposes no requirement that the terms and provisions of a contract shall be the same as, or similar to, those that neighbors and trade associates of the contracting parties are accustomed to agree upon. *Id.*, § 556, p 242. Before a usage or custom of trade, otherwise affirmatively proved to exist, can be invoked to construe a contract, it first must be shown that the party against whom it is asserted knew of the usage and had reason to know that the other party assented to the words of the contract in accordance with it, or that; if the party against whom it is asserted did not know of the usage, an ordinary person in that party's position would have known of it. *Id.*, § 557, pp 246-247.

*J J Fagan, supra*, must be understood in this context. Nothing therein purported to abolish general precepts of contract construction. To the contrary, the Supreme Court in *J J Fagan* expressly recognized that another general precept of contract law, that a

contract is construed against the party responsible for drafting a disputed provision, applies to oil and gas leases such that use of form contracts, as here, requires that the terms of the contract be construed "for the benefit of the lessor and against the lessee . . . ." *J J Fagan* at 681. Moreover, the Supreme Court noted that, in a situation similar to that here presented, such form agreements could be modified to clarify such understandings or meanings and that the rule by which these leases are construed for the benefit of the lessor and against the lessee should not be relaxed when the lessee has opted to rest on ambiguity. *Id.*

Thus, plaintiffs and amici curiae correctly argue that ambiguities in the oil and gas lease should be resolved in favor of the lessors as a policy matter.[4] Nonetheless, both on the basis of how other courts have construed this language and in consideration of the language itself, defendant's interpretation of the disputed phrase is correct, in our judgment.

Basic principles of economics require that, in determining the "gross proceeds at the wellhead" in the absence of an actual sale of gas at the wellhead resulting in ascertainable gross proceeds, the gross proceeds from a sale elsewhere must be extrapolated, backwards or forwards, to reflect appropriate adjustments due to differences in the location, quality, or characteristics of what is being sold. These principles apply to natural gas as well as to other sales. 3 Wil-

---

[4] Their reliance on foreign authority—*Hanna Oil & Gas Co v Taylor*, 297 Ark 80, 82; 759 SW2d 563 (1988), and *West v Alpar Resources, Inc*, 298 NW2d 484, 490-491 (ND, 1980) (ambiguities in the allocation of post-production costs should be construed against the lessee because the lessor is not informed about the law applicable to oil and gas leases)—in support of their proposition is unnecessary.

liams & Meyers, Oil & Gas Law § 650.2, p 640; *Green-shields v Warren Petroleum Corp*, 248 F2d 61 (CA 10, 1957). Here, the only place gas is sold is at Kalkaska, approximately thirty miles from the wellhead. And at that point the gas sold has been altered, both by being transported to a point at which a large buyer like Michcon is willing to accept the production from a relatively small leasehold and by being processed to eliminate impurities so the purchaser can put the commodity directly to its intended end uses. The efficiency and reliability of the market in Kalkaska has also presumably been strengthened by marketing and other fixed costs incurred by defendant. These enhancements are the result of effort and monetary expenditure by defendant, which expenses are properly deducted from the price paid in Kalkaska at the point of sale to determine the "gross proceeds at the wellhead." As with any other sale of goods, there is one price for goods sold f.o.b. the seller's place of production, where the buyer must pay freight costs and accept the risks of loss during transportation, and a second, higher price if the goods are sold on the understanding that the seller, at its own risk and expense, will deliver them to the buyer at the buyer's place of use. Those two values would merge into one only if the buyer and the seller happened to be located in the same place.[5]

---

[5] We also believe that this construction has the virtue of establishing a uniform location for ascertaining the value of the gas, namely, its value at the wellhead. Plaintiffs' construction would establish as the valuation point whatever location at which the gas ultimately becomes marketable, thereby resulting in potentially different valuations for the product of the same well. Plaintiffs' construction of "gross proceeds at the wellhead" is apparently indistinguishable from their construction of "gross proceeds at the market." We are also persuaded that a regular course of dealing in the industry would be undermined by a rule, such as that proposed by certain

To the extent a different interpretation of the term "gross proceeds at the wellhead" is possible, plaintiffs failed to adduce any evidence in support of such a construction in opposition to defendant's motion for summary disposition. Because plaintiffs have the burden of proof or at least the burden of production in this respect, summary disposition was properly granted. *Quinto v Cross & Peters Co*, 451 Mich 358, 362-363; 547 NW2d 314 (1996).

We also find guidance for interpreting "gross proceeds at the wellhead" in case law from other jurisdictions. In *Atlantic Richfield Co v State of California*, 214 Cal App 3d 533; 262 Cal Rptr 683 (1989), the court interpreted the language "at the well" when used in reference to an oil and gas royalty valuation. Although in *Atlantic Richfield*, the court was interpreting a statute, the court surveyed oil and gas law with respect to leases and held at 541-542:

> The term "at the well," when used with reference to oil and gas royalty valuation, is commonly understood to mean that the oil and gas is to be valued in its unprocessed state as it comes to the surface at the mouth of the well. (*Piney Woods Country Life School v Shell Oil Co* (5th Cir 1984), 726 F2d 255, 240, cert den *Shell Oil Co v Piney Woods Country Life School* (1985) 471 US 1005, 105 S Ct 1868, 85 L Ed 2d 161; 3 H Williams, Oil and Gas Law (1981), § 645.)
>
> When the term "at the well" is used in connection with "market price," other established principles apply. It is the rule in California that unless there is clear language to the contrary, the lessor of an oil and gas lease, such as State,

amici curiae, in which *some* postproduction costs, i.e. "nonmarketing" costs, could be considered in determining valuation but not other postproduction costs, i.e. "marketing" costs. Such distinctions are not merely imprecise but arbitrary as well. We presume that virtually all postproduction expenses incurred by energy companies are designed, in one way or another, to enhance the value of their product.

bears its proportionate share of processing costs incurred
downstream of the well. (*Alamitos Land Co v Shell Oil Co*
(1935) 3 Cal 2d 396, 44 P2d 573.) In addition, it is commonly
understood that "market price at the well" is often deter-
mined by working back from the price at the point of sale,
deducting the cost of processing and transportation to the
wellhead, to determine "market value at the wellhead"; (for
a clear exposition of this rule, see G Siefkin, *Rights of Les-
sor and Lessee with Respect to Sale of Gas and as to Gas
Royalty Provisions*, Sw Legal Fdn Fourth Annual Institute
on Oil and Gas Law and Taxation (1953), p 202).

This interpretation has also been used in *Frey v
Amoco Production Co*, 943 F2d 578, 583 (CA 5, 1991),
opinion withdrawn in part on other grounds 951 F2d
67 (CA 5, 1992), and *Merritt v Southwestern Electric
Power Co*, 499 So 2d 210, 214 (La App, 1986). The
rationale in both of these cases was essentially the
same as in *Atlantic Richfield*—the term "at the well "
is used as a way to allocate refining and transporta-
tion costs between the lessor and lessee. "At the well"
refers to proceeds minus refining and transportation
costs, as opposed to proceeds at the point of sale,
where refining and transportation costs are not
deducted.

In *Old Kent Bank & Trust Co v Amoco Production
Co*, 679 F Supp 1435 (WD Mich, 1988), the court simi-
larly interpreted the language "one-eighth of the gross
proceeds . . . received from the sale thereof at the
mouth of the well." *Id.* at 1438. The court held that
the meaning of "gross proceeds" was self-evident: the
contract price settled on by the producer of the gas
and the buyer. *Id.* at 1445. However, the court further
held that the term "amount realized at the mouth of
the well" was less clear. Also relying on trade usage,
the court held that the phrase should be interpreted

to encompass proceeds less the expenses to make the gas marketable because the gas was not marketable at the wellhead; if the parties did not want to share the postproduction costs, they could have used the phrase "at the market." *Id.* The court, *id.* at 1445, also relied on 3 Williams & Meyers, Oil and Gas Law, § 645.2, p 596 (1986), in support of its conclusion:

> "A royalty or other nonoperating interest in production is usually subject to a proportionate share of the costs incurred subsequent to production where, as is usually the case, the royalty or nonoperating interest is payable 'at the well.' "

We adopt the interpretation of "at the well(head)" as used in these cases because we believe that it better conforms with the parties' intent as gleaned from the contractual language. In interpreting contracts capable of two different constructions, we prefer a reasonable and fair construction over a less just and less reasonable construction. *B Siegel Co v Wayne Circuit Judge*, 183 Mich 145, 153; 149 NW 1015 (1914). In this case, the use of the language "gross proceeds at the wellhead" by the parties appears meaningless in isolation because the gas is not sold at the wellhead and, thus, there are no proceeds at the wellhead. However, if the term is understood to identify the location at which the gas is valued for purposes of calculating a lessor's royalties, then the language "at the wellhead" becomes clearer and has a logical purpose in the contract. In construing "wellhead" thusly—in a manner that seeks to accord reasonable meaning to the plain language of the contract—we believe that it necessarily follows that to determine the royalty valuation, postproduction costs

must be subtracted from the sales price of the gas where it is subsequently marketed.

Further, to accede to plaintiffs' interpretation of "gross proceeds at the wellhead" would be to require defendant to pay royalties to plaintiffs, based not only on the value of the gas at the wellhead, but also upon the costs that defendant has incurred to prepare the gas for, and transport the gas to, market. Thus, plaintiffs' royalties would be increased merely as a function of defendant's own efforts to enhance the value of the gas through postproduction investments that it has exclusively underwritten. We simply do not believe that such an interpretation of the disputed term is more compatible with either the plain language of the agreement or with the logical expectations of the parties to the agreement.

At first glance, it is unclear why the parties would choose to use the language "at the wellhead" to allocate postproduction costs rather than just stating expressly the allocation of such costs. However, the lack of such explicit language allocating postproduction costs is not, by itself, a reason to discount defendant's interpretation of "at the wellhead" in light of the fact that the instant provision is a standard gas lease provision. The use of standard clauses reflects customary practices in the industry:

> Inasmuch as gas royalty is ordinarily payable in money rather than in kind and is measured by value or proceeds at the wellhead, *it is not customary,* as in the case of the oil royalty payable in kind, *to specify that the royalty is free of cost of production.* [3 Williams & Meyers, Oil and Gas Law, § 643.2, p 529 (emphasis added).]

Accordingly, we will not hold defendant liable for failing to expressly specify the allocation of the burden for postproduction costs. Although the contract could have been made clearer, we believe that it is nevertheless sufficiently unambiguous.

Additionally, interpreting "gross proceeds at the wellhead" to refer to proceeds minus postproduction costs is consistent with the way that the Michigan severance tax tax base is calculated. In the context of natural gas production, this work-back method of calculation is already used in determining the Michigan severance tax tax base, wherein the tax base is determined based on the value of the natural gas at the point it is severed or removed from the ground. MCL 205.303; MSA 7.353; *Oryx Energy v Dep't of Treasury*, unpublished opinion per curiam of the Court of Appeals, issued July 23, 1996 (Docket No. 181915). The *Oryx Energy* Court recognized that gas has no value at the point that it is severed from the ground and adjusted the tax base to reflect that fact. The *Oryx Energy* Court specifically held:

> [T]o determine value at the point of severance [the wellhead], defendant should subtract all costs necessary to make the gas salable, including the costs of purification. Thus, plaintiff should be taxed on the value of all gas at the point of severance (market value of all the gas minus all purification costs after severance).

Additionally, in dealing with the calculation of the severance tax tax base of oil that had no value at the point of severance because it was too far from the market, the Attorney General, relying on *Cumberland Pipe Line Co v Commonwealth ex rel Kentucky State Tax Comm*, 228 Ky 453; 15 SW2d 280 (Ky App, 1929), also used the work-back method of calculation:

> The [*Cumberland Pipe Line* court held] that if there [is] no market at the particular place at which it is determined to fix market value, the market value is established by making downward adjustments to the commodity's price at the nearest market to compensate for the cost of transportation to that market.
>
> The view of the Kentucky court appears eminently logical and is consistent with economic theory which holds that transportation from the point of origination to the market augments the value of a commodity, and that the increment of added value conferred upon the commodity by the transportation is reflected in the higher price it commands at the market place. [OAG, 1961-1962, No 4010, pp 590, 593 (November 14, 1962).]

This use of the work-back method of calculation in the case of oil and gas severance tax law supports the use of the language "at the wellhead" as a method of calculating the allocation of postproduction costs.

Plaintiffs urge us to consider the parties' course of conduct—that defendant did not deduct postproduction costs for almost three years after the agreement was entered into—rather than the terms' technical definitions to determine the parties' understanding of the agreement at the time it was signed. Generally, extrinsic evidence is not admissible where a contract is clear and unambiguous. *Goodwin, Inc v Orson E Coe Pontiac, Inc*, 392 Mich 195, 204; 220 NW2d 664 (1974). See also *Schmude Oil Co v Omar Operating Co*, 184 Mich App 574, 580; 458 NW2d 659 (1990). And, while generally a course of performance is highly persuasive evidence of proper contract interpretation when introduced against the party so performing, the law also recognizes that a party may undertake a wrong interpretation of the words of a contract and the other party should never be permit-

ted to profit by such mistake in the absence of an estoppel arising from a prejudicial change of position in good-faith reliance on such performance. 3 Corbin, Contracts, § 558, p 259. Although plaintiffs obviously were happy to be paid what they received in the initial months of the lease, the record is devoid of evidence that they materially changed their position in detrimental reliance on any such course of performance by defendant so that any estoppel arises to prevent defendant from recognizing its mistake and correcting it.

This issue, however, is made more difficult by two different approaches taken by other jurisdictions in interpreting similar language. Plaintiffs and amici curiae cite *Garman v Conoco, Inc*, 886 P2d 652 (Colo, 1994), in support of their argument that the implied duty to market gas includes the duty to pay for all marketing costs. In *Garman*, the court held:

> The purpose of an oil and gas lease could hardly be effected if the implied covenant to drill obligated the lessor to pay for his proportionate share of drilling costs. In our view the implied covenant to market obligates the lessee to incur those post-production costs necessary to place gas in a condition acceptable for market. [*Id*. at 659.]

We find it unnecessary to decide whether Michigan recognizes an implied duty to market because we see no reason to require defendant to bear fully the cost of postproduction marketing under an implied duty to market where the express royalty clause delineates how such costs are to be apportioned. Even the *Garman* court limited its decision to the instance where " 'the assignment creating the overriding royalty interest' is indeed silent with respect to the allocation of post-production costs." *Id*. at 654.

In the absence of ambiguity, rules of construction such as reliance on a course of performance are unnecessary to this Court's task and accordingly we regard such evidence as reflective of no more than a mistake on defendant's part and thus as ultimately irrelevant.

With respect to other aspects of the complaint, plaintiffs next argue that defendant is collaterally estopped from marketing the gas at a rate below $3.15 per Mcf because by stipulation and order of judgment in another case, the plaintiffs brought in the Otsego Circuit Court against Terra Energy, Limited, and Energy Reserves, Inc., *Schroeder v Terra Energy, Ltd*, entered January 27, 1992 (File No. 91-5003-CZ), Energy Reserves was required to sell gas to defendant under its contract with Michcon. Because plaintiffs did not make the collateral estoppel argument below, they may not raise it on appeal. *Peterman v Dep't of Natural Resources*, 446 Mich 177, 183; 521 NW2d 499 (1994).

However, taking plaintiffs' allegations as true, they do allege a claim of breach of contract that should not have been dismissed pursuant to MCR 2.116(C)(8). Plaintiffs alleged that a letter agreement was signed by themselves, defendant, and Energy Reserves wherein, in exchange for an assignment by defendant of a two percent royalty interest in plaintiffs' property, defendant had a right to sell gas to Michcon under the Energy Reserves/Michcon contract. Plaintiffs alleged that defendant breached the contract by failing to obtain the Energy Reserves/Michcon contract rate by releasing Michcon from its obligation of buying the gas. Defendant argues that the Energy Reserves/Michcon contract

required Michcon to approve the assignment of plaintiffs' gas and that even after extensive, good-faith negotiation, Michcon did not approve the assignment. Because defendant did not support its contentions with any documentary evidence, the trial court erred in dismissing the case. *Quinto v Cross & Peters*, *supra* at 362, citing *Neubacher v Globe Furniture Rentals, Inc*, 205 Mich App 418, 420; 522 NW2d 335 (1994). Thus, we remand this matter with regard to the issue whether defendant breached the agreement by improperly releasing Michcon from having to buy plaintiffs' gas or by not negotiating with sufficient vigor with Michcon for assignment of the gas.

Plaintiffs further argue that defendant was required by the contract to obtain the best available market price. We disagree. The agreement between the parties uses the language "prevailing market rate." In *G&A Inc v Nahra, supra* at 330-331, this Court held:

> If a contract's language is clear, its construction is a question of law for the court. When presented with a dispute, a court must determine what the parties' agreement is and enforce it. Contractual language is given its ordinary and plain meaning, and technical and constrained constructions are avoided. [Citations omitted.]

"Prevailing" has been defined as "predominant." *Random House Webster's College Dictionary*, p 1070. Plaintiffs argue that MCL 565.5; MSA 26.524, which states that "[n]o covenant shall be implied in any conveyance of real estate, except oil and gas leases, whether such conveyance contain special covenants or not," in conjunction with an implied covenant to market the oil and gas produced, requires defendant to obtain the best available rate. We do not believe that *Michigan Wisconsin Pipeline Co, supra* at 84,

cited by plaintiffs would support the conclusion that there are implied covenants in oil and gas leases that would require defendant to obtain the best market rate. Thus, the trial court properly ruled that defendant was under no affirmative duty to obtain the best market rate.

Finally, plaintiffs argue that the trial court improperly sanctioned plaintiffs for filing a frivolous complaint and awarded defendant costs. We agree. A trial court's finding that a claim is frivolous is reviewed for clear error. *Dillon v DeNooyer Chevrolet Geo*, 217 Mich App 163, 169; 550 NW2d 846 (1996). A claim is frivolous when the party's legal position is devoid of arguable legal merit. MCL 600.2591; MSA 27A.2591. Because the issue of postproduction costs has not been clearly decided in Michigan, and because there is a split of authority in other states, the trial court, in our judgment, erred in its finding that plaintiffs' claim was frivolous. *See McKnight v General Motors Corp*, 511 US 659; 114 S Ct 1826; 128 L Ed 2d 655 (1994). Indeed, we find the principal issue raised by plaintiffs to be an extremely difficult issue. Therefore, we reverse the trial court's award of sanctions and costs.

Affirmed in part, reversed in part, and remanded in part. We do not retain jurisdiction. No taxable costs pursuant to MCR 7.219(A), neither party having prevailed in full.