# STATE OF MICHIGAN

# COURT OF APPEALS

DIPONIO CONTRACTING, INC.,

        Plaintiff/Counter-Defendant-
        Appellee,

v

CITY OF HOWELL,

        Defendant/Counter-Plaintiff-
        Appellant.

UNPUBLISHED
April 14, 2015

No. 319295
Livingston Circuit Court
LC No. 11-026309-CK

Before: OWENS, P.J., and JANSEN and MURRAY, JJ.

PER CURIAM.

This contract dispute arises from a road reconstruction project. Defendant appeals as of right from the trial court's amended judgment for plaintiff DiPonio Contracting, Inc. (hereinafter DCI). Defendant contends that the trial court erred when it awarded it a setoff limited to 10 days of liquidated damages, totaling $15,500, on its counterclaim against plaintiff. We affirm.

## I. BACKGROUND

In January 2010, DCI bid on and was awarded a construction project for defendant known as the Multi Year Road Improvement Program, Phase II. The project involved the installation of new roads, sanitary sewer, water lines, and storm sewers. Engineering firm Hubbell, Roth & Clark (HRC) served as the project manager. The contract provided that construction was to begin "no earlier than May 3, 2010." The project was originally designed and bid as a road replacement project with a small quantity of sanitary/storm sewer work. However, after the contract was awarded, DCI received a set of revised plans, at least one significant change order, and several contract modifications between the starting date in May, and the ultimate final completion date in July 2011. DCI was also asked by defendant, at least twice, to stop work and make some emergency repairs that were unrelated to the road project.

Ultimately, the roads were completely topped and available for safe use by the motoring public, with all traffic control devices installed, on November 21, 2010. DCI continued to work on the project until December 2, performing clean-up at the site as well as "raking topsoil for greenbelt restoration." Some signs were also installed. HRC considered December 9 the seasonal shut down date for the project.

-1-

On May 4, 2011, DCI received a three-page letter from HRC containing numerous punch list items. DCI informed HRC that it was treating the letter as the "final" punch list for the project and that it would "entertain no additional punch lists whatsoever." DCI returned to the project on May 16, 2011 to complete the additional punch list items; DCI completed its work on May 20. DCI believed the project was completed on May 26 when its subcontractor completed the road striping.

However, a June 16, 2011 construction pay estimate report reflected liquidated damages, calculated as "32 calendar days, from May 16, 2011 to June 16, 2011, at $1,550 per day for a total of $49,600. These liquidated damages will continue to be charged until the project is completed." HRC contended that DCI did not complete the contract until State Barricades placed street name signs on July 1, 2011. However, the June 20, 2011 contract modification indicated that it was requested "to add the following items to the contract." The "new items" were street signs, and the reason provided was, "The plans called for replacement, but a new pay item was negotiated to install new post, mounting brackets, and street 'name' signs." DCI believed that, because defendant changed the brackets that were to be used to hang the signs in June 2011, defendant prevented DCI from completing the project, which precluded defendant from being entitled to liquidated damages.

Ultimately, the project as completed cost less than the project as awarded including change order 1. There were no outstanding construction issues or quality issues. Nevertheless, defendant refused to pay DCI the remaining $121,872.52 due under the contract.[1]

On October 11, 2011, DCI filed a complaint against defendant, alleging breach of contract and unjust enrichment. Defendant filed a counter-complaint against DCI, alleging that, under the contract, it was entitled to liquidated damages of $88,350 for DCI's failure to complete the project on time. After a seven-day bench trial,[2] the trial court explained that it "generally adopt[ed] plaintiff's finding of facts," the result of which was an award for DCI for the full amount of its contract claim, $121,872.51, set off by an award to defendant of 10 days of liquidated damages at a rate of $1,550 a day, or $15,500, equating to a net judgment of $106,372.51, plus statutory interest. An amended judgment was subsequently entered that included an award to DCI of $24,381.20, plus statutory interest, for post-case evaluation taxable costs and attorney fees pursuant to MCR 2.403(O).

## II. STANDARD OF REVIEW

We review a trial court's findings of fact in a bench trial for clear error and its conclusions of law de novo. *Chelsea Investment Group, LLC v City of Chelsea*, 288 Mich App

---

[1] DCI's original contract bid was $2,058,608.30. After the unit prices were amended because of the work in change order 1, the contract as awarded was $2,463,242.80. The total undisputed amount due under the contract was $2,444,417.48. DCI received $2,322,544.97.

[2] The complaint included DCI's request for $14,225.07 for additional traffic-control devices. The trial court denied relief on this issue and it has not been cross-appealed.

239, 250; 792 NW2d 781 (2010). "A finding is clearly erroneous if there is no evidentiary support for it or if this Court is left with a definite and firm conviction that a mistake has been made." *Id.* "Special deference is given to the trial court's findings when they are based on the credibility of the witnesses." *Woodington v Shokoohi*, 288 Mich App 352, 355; 792 NW2d 63 (2010). Questions involving the proper interpretation and legal effect of a contract are reviewed de novo. *Alpha Capital Mgt, Inc v Rentenbach*, 287 Mich App 589, 611; 792 NW2d 344 (2010).

## III. EXTENSION REQUESTS

Defendant argues that the trial court's determination that it wrongfully denied DCI's requests for extensions of time was clear error and contrary to the contract. Defendant focuses on the contract provision found in section 4.2:

> If the Contractor shall be unavoidably delayed in beginning or fulfilling this Contract by reason . . . of extra Work ordered by the City or by an act, neglect, delay or default on the part of the City then the completion date specified may be advanced as the Engineer or Inspector, whose duties and authority are defined in the General Conditions, may adjudge to be just and reasonable. Formal claim for such extension shall be made in writing by the Contractor within seven (7) days after the date upon which such alleged cause of delay shall have occurred.

The parties agree that §§ 108.09 and 108.10 of the MDOT 2003 Standard Specifications for Construction (DX B) apply. Those provisions provide as follows:

> **108.09 Extension Of Time On Calendar Day or Calendar Date Contracts.** When the contract time is specified in calendar days or by calendar date, an extension of the time for opening to traffic and the contract time will be allowed by the Engineer without liquidated damages on each of the following basis:
>
> * * *
>
> C. If there are delays due to unforeseen causes beyond the control and without the fault or negligence of the Contractor, including but not restricted to: . . . acts of Government, acts of State or any political subdivision . . . , then the extension will be the time the delay affects the controlling operation.
>
> * * *
>
> E. On a controlling operation, when there is an increase in the quantities set forth in the contract and this is not offset by decreased similar controlling items of work, the extension of time will be based on Formula 108-2.
>
> $$E_c = T_c \text{ x } I/Q \qquad \text{Formula 108-2}$$
>
> where:
>
> $E_c$ = Extension of time in calendar days
> $T_c$ = Contract time assigned to the item on the progress schedule

-3-

I = Increased quantity of the contract item

Q = Contract quantity of the item

F. If the Extra Work delays the controlling operation, as shown in the progress schedule, the extension of time will be the time required to do the Extra Work.

G. Another equitable measure, supported by an acceptable rationale, may be used to determine extensions with the approval of the Engineer.

**108.10 Request For Extension Of Time For Work Day, Calendar Day And Calendar Date Contracts.** Requests for extension of time, shall be filed by the Contractor with the Engineer. The request shall be in writing and state the reasons for the extension. In case of delays due to adverse weather, the request for extension of time shall be filed within 14 days following the end of the calendar month in which the delay occurred. All other delays shall be filed within 14 days following the end of the delay. Failure to notify the Engineer as provided herein, will constitute a waiver of claim for an extension of time.

Extension of time may be granted either with or without liquidated damages and will be stated in the same terms as the original contract time is stated. The number of working days, or calendar days, granted for each extension will be recorded by authorization. The time for opening to traffic and the contract time as extended shall thereafter be binding upon the Contractor and Surety as if they appeared in the contract originally.

If the Contractor intends to file a claim based upon the denial of an extension of time request for any reason not specifically covered elsewhere in the contract, the Contractor shall notify the Engineer in writing within seven days after receipt of the denial.

\* \* \*

Defendant contends that it denied plaintiff's requests because they were not timely, did not include the requisite information, and were not formally made. The record, however, supports the trial courts findings.

A. EXTENSION REQUEST 3: DELAY IN EXECUTION OF CHANGE ORDER 1

As early as May 27, 2010, DCI informed defendant, in writing, that it intended to seek an extension of time for the project delay caused by the delay in the execution of change order 1 and the issuance of the notice to proceed. On January 7, 2011, DCI sent defendant another letter setting forth a more detailed breakdown of its request for 20 work days. On January 28, 2011, this request was submitted to defendant for a third time, this time on an MDOT form and labeled as extension request 3. Given that DCI received the approval of change order 1 on May 20, 2010, the trial court correctly found that the May 27 letter complied with § 4.2 of the contract, as it was "made in writing by the Contractor within seven (7) days after the date upon which such alleged cause of delay shall have occurred."

Furthermore, MDOT § 108.09(C) provides that an extension "will be allowed by the Engineer without liquidated damages" in the event of "delays due to unforeseen causes beyond the control and without the fault, or negligence of the Contractor, including . . . acts of government, acts of State or any political subdivision." The extension "will be the time the delay affects the controlling operation." Here, under the evidence submitted it was reasonable to conclude that because the delay was caused by defendant's lateness in approving change order 1, and did not involve any fault or negligence on DCI's part, the extension should have been granted, regardless of whether the requests complied with section 4.2 of the contract. And, because the delay caused a delay in the start of the sewer—which even HRC and defendant do not dispute was a controlling operation—the trial court properly found that the request for the entire delay in the start of the project should have been granted.

Accordingly, the trial court's determination that this extension request was wrongfully denied is supported by the record.

## B.  EXTENSION REQUEST 2: DELAY CAUSED BY CHANGE ORDER 2/ROAD WIDENING

The record also supports the trial court's determination that defendant wrongfully denied DCI's extension request for the additional work created by change order 2—the road widening. DCI was notified on May 18, 2010, that the road width was being increased by two feet. Clifford Rhodes indicated that DCI could not calculate or quantify the impact of the widening of the roads on the project's schedule because change order 2 did not include any quantities, but that it was common knowledge that this would cause an increase in the quantities of things like aggregate, asphalt, excavation, and embankment. The June 30, 2010 meeting minutes reflect that defendant was aware that DCI was looking at increased quantities, but rather than consider them, it instructed DCI to determine whether other quantities, such as swale, would decrease, making an offset.

Thus, on October 21, 2010, after roughly 50 percent of the roads that needed to be widened had been completed, DCI requested an extension of 8 work days "due to the increase in work." After HRC denied the request, on November 1, DCI sent a letter, again requesting the eight-day extension, including the new proposed open to traffic and completion dates and explaining the need for the request:

> On May 13, 2010 when HRC notified [DCI] that the roads were to be widened from 18' to 20' it was unclear at that time what impact the additional work would have on the construction schedule. As of October 21 [DCI] had completed construction on approximately 50% of the widened areas and determined that based on the work that was completed and the work remaining the approximate increase in contract quantities.

Given that the form of this request is nearly identical to the form of the granted extension from change order 1, it is unclear what HRC and defendant found deficient about this request. Their response was simply that "[i]t is still unclear how the entire project will be completed, including punch list items by the November 27th date stated in your correspondence." Notably, the denial

does not appear to have been based on the lack of timely notification, but defendant's desire for additional information on how the achievement of the revised dates would be achieved.

Moreover, the fact that the road-widening work was performed between August and November made the October and November notification letters timely under MDOT § 108.10. MDOT § 108.10 provides that "[a]ll other delays shall be filed within 14 days following the end of the delay." The last of the work associated with change order 2 occurred on November 21. Thus, the end of the delay caused by change order 2 did not occur until November 21, rendering DCI's October 21 and November 1 written extension requests timely.

Hence, the record supports the trial court's conclusion that defendant's third denial of this extension request, which occurred on January 31, was unreasonable.

## C. EXTENSION REQUESTS 2, 4-5, 7, 10-13: DELAYS FROM QUANTITY OVERAGES IN CONTROLLING OPERATIONS

Further, assuming that DCI's letters did not adequately comply with the contract or MDOT § 108.10 notification requirements, the record indicates that the road widening extension request, as well as the remaining extension requests based on overage quantities, were all mandatory and, therefore, wrongfully denied by defendant. Rhodes testified that he considered change order 2 a directive and that it was a quantity increase, rather than extra work or a delay. Accordingly, the extra time necessary was not governed by contract § 4.2, but by MDOT § 108.09(E), which was simply a formula that was calculated based on the quantities once those were established. Moreover, MDOT § 108.09 expressly provides that the extension "will be allowed by the Engineer without liquidated damages."

DiPonio and Rhodes testified that the remaining extension requests could not be completed until January because they were waiting on the contract quantities to be determined by defendant and, because that did not occur until January, they could not complete the computation set forth in MDOT § 108.09(E) until that time. DiPonio also testified that an extension could not have been requested prior to the quantities being balanced because some of them could have decreased. This was consistent with the testimony from Roger Crouse, the construction manager for HRC, who testified that the contract modifications were not issued before January 2011 because additional concrete in one area of the project could be offset by less concrete later, so writing a contract modification each time an overage occurred would "spend[] a lot of people's time unnecessarily." DiPonio testified that balancing modifications are generally done on a monthly basis, and Rhodes testified that if HRC had verified and finalized the quantities on a daily or weekly basis and timely submitted them to DCI, DCI would have submitted their extension requests prior to January 2011.

Defendant contended that MDOT § 108.09(E) was inapplicable because none of the overages occurred on a controlling item. Nancy Faught, the project manager for HRC, conceded that the road widening constituted extra work, although she disputed whether that required extra time on the schedule. She explained that, assuming a bid included 300 days for sanitary sewer and 100 days for road work, but the additional work resulted in 150 days for road work, that "doesn't necessarily mean the whole project should take longer," "[c]ause the sanitary sewer had more based on their CPM [Critical Path Method Network] took more effort." However, the trial

-6-

court went on to confirm with Faught that road work necessarily occurs at the end of the project, after the sewer is completed. Faught's testimony highlighted why DCI's request was reasonable—the additional work involved the final stages of completion of the roads, which could only happen after the sewer portion was complete. Faught also conceded that if the slope of driveways was changed due to the road width, and needed to be redone, it would result in additional work, and such work also fell at the final stages of completion.

Furthermore, Faught conceded that DCI, not the HRC, decides what is a controlling item. She also conceded that "it could be typical" that once any particular controlling item is completed, the next item becomes the controlling item—such as once the sanitary sewer was done, the water mains become the controlling item. And, in fact, although Crouse initially testified that the expansion of the roadways was not a controlling item, he later conceded that HMA (hot mix asphalt) was, in fact, a controlling item on the CPM for several of the streets. Indeed, the CPM reflected that the HMA base, HMA top, restoration, aggregate base, and other items related to the road widening were listed in red and, therefore, controlling items. Further, Reid Shaber Charles, defendant's city manager, agreed that "[a]t some point in time" nearly every major operation was on the critical path.

Thus, defendant's contention that the quantities for which the extensions were sought under MDOT § 108.09(E) were not related to controlling items was not supported by the record. And, because MDOT § 108.09(E) mandates the granting of such extensions without liquidated damages being imposed ("will be allowed by the Engineer without liquidated damages"), the trial court's conclusion that defendant wrongfully denied DCI's extension requests related to additional quantities was supported by the record.

## D. EXTENSION REQUEST 9: SIGNAGE

DCI's extension request 9, which related to the signs, is only partially at issue because the trial court determined that DCI's request for 20 days was excessive, granting it only 10, and declared that defendant was entitled to liquidated damages for the other 10 days requested. According to the extension request, defendant requested additional signs on November 19 and 26. The request is dated January 11, 2011, which is well-beyond the contractual notice provision. However, the record indicates that changes were made and quantities added to the signage in spring/June 2011. Thus, under MDOT § 108.10, which only requires delays be filed "within 14 days following the end of the delay," the January request occurred well before the June end of the delay, rendering DCI's extension request 9 timely. Hence, defendant's denial of this extension request, which occurred on January 31, was unreasonable. The trial court's award of 10 days liquidated damages is affirmed.

## E. EXTENSION REQUESTS 6 & 8: EXTRA WORK

DCI's extension requests 6 and 8 were for additional work requested by defendant that was not part of the contract. There is no question that these requests were first made in January 2011; there were no prior verbal or written requests. The trial court determined that the denial was unreasonable, in part, because defendant had expressly requested DCI complete the additional work.

MDOT § 108.09 requires an engineer to extend a contract without liquidated damages if one of its subsections applies. MDOT § 108.09(E) provides, "If the Extra Work delays the controlling operation, as shown in the progress schedule, the extension of time will be the time required to do the Extra Work." However, it was undisputed that the contract still required claims for delays necessitated by extra work be made within seven days of the date "upon which such alleged cause of delay shall have occurred." DCI argues that these two extension requests were timely because the work evidenced in the requests appeared in contract modification 5, which was issued on February 24, 2011 and, therefore, the January 28 request satisfied the seven-day requirement. The findings of fact and conclusions of law adopted by the trial court simply state that the requests were "reasonable and timely in light of the circumstances."

Under the Michigan Uniform Commercial Code, course of performance is defined as:

[A] sequence of conduct between the parties to a particular transaction that exists if both of the following are met:

(a) The agreement of the parties with respect to the transaction involves repeated occasions for performance by a party.

(b) The other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection. [MCL 440.1303(1).]

Although the UCC applies to sale-of-goods contracts, course of performance is a well-recognized rule at common law and, therefore, also applicable to service contracts. See Restatement Contracts, 2d, §34 and § 209 comment a. Moreover, the Restatement explicitly indicates that an integrated writing "may be explained or supplemented by operative usages of trade, . . . and by the course of performance of the agreement." Restatement Contracts, 2d, § 209 comment a.

A course of performance is generally considered "highly persuasive evidence of proper contract interpretation when introduced against the party so performing . . . ." *Schroeder v Terra Energy, Ltd*, 223 Mich App 176, 191; 565 NW2d 887 (1997). Even if parties have stipulated that modification of an agreement may only occur by writing, "a modification or waiver can be established by clear and convincing evidence that the parties mutually agreed to a modification or waiver of the contract," *Quality Prods & Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 372; 666 NW2d 251 (2003), because "the parties possess, and never cease to possess, the freedom to contract even after the original contract has been executed," *id*. Thus, evidence of subsequent oral or written modifications of a contract are not excluded by the parol evidence rule. See *Mich Nat'l Bank of Detroit v Holland-Dozier-Holland Sound Studios*, 73 Mich App 12, 14; 250 NW2d 532 (1976). Whether the parties agreed "to modify the contract can be deduced from their course of conduct if it is unequivocal and the terms of modification are definite, certain, and intentional." *Detroit Police Officers Ass'n v Detroit*, 452 Mich 339, 345; 551 NW2d 349 (1996).

Here, the trial was replete with testimony that defendant had orally waived numerous provisions of the contract. Crouse testified that defendant waived the contractual requirement

that the contractor fill in all hole excavations and open the road to two-way traffic at the end of the day because it would save one to two hours of time each day. Charles confirmed that DCI was permitted to "jump[] from street to street to street . . . with our blessing." In addition, defendant waived the requirement that "work be sequenced in a train like manner" because it "was attempting to help them move as fast as they could." Defendant also waived the requirement that items of extra work be communicated to DCI in writing. Instead, it directed DCI in the field to complete additional work and then subsequently issued a contract modification reflecting the work, which is what occurred with the emergency sewer work in extension requests 6 and 8.

Without question, the record shows that defendant requested the emergency work without complying with the writing requirements in the contract and subsequently issued a contract modification providing for that work. In addition, defendant had previously waived other provisions of the contract to permit the project to move forward more quickly. Thus, the parties established a course of performance whereby the parties could orally inform one another of issues and subsequently provide a writing regarding the same issue. Under such circumstances, where defendant knew its emergency requests would require DCI to stop working on the project, the trial court justifiably concluded that it was unreasonable for defendant to deny requests for extension 6 and 8.

### III. LIQUIDATED DAMAGES

Defendant also contends that the trial court erred by applying an equitable standard and refusing to apply the contract's liquidated damages provision.

Although defendant devotes a large portion of its argument to the contention that the liquidated damages provision in the contract was enforceable, the fact is that the trial court awarded it 10 days' worth of liquidated damages. Thus, the record does not support defendant's contention that the trial court "refused" to apply the liquidated damages provision, or that it found it unenforceable.

Nevertheless, defendant is correct that in its decision the trial court referenced equity, stating that

> [i]f I were to impose the liquidated damages clause as requested by the—by the City, it would just strictly be a penalty without—without reason. And I—and I just simply can't do that in equity. And I think the law . . . would not allow it to—to have a liquidated damages clause bein' [sic] just an absolute punitive sanction for no other good reason.

However, this statement was made in the middle of a broader discussion, which the trial court concluded with, "I do find that there were good reasons for the extra time that DiPonio requested, so that's why I have ruled as I have on granting liquidated damages only where I see them [the requests for extra time] actually bein' [sic] a little stretched."

Viewed in context, the trial court's statement was not that the liquidated damages provision was unenforceable, but that, given that DCI's extension requests were appropriate and

that defendant had unreasonably refused to grant them, once those extensions were accounted for, only 10 days of liquidated damages were appropriate. Accordingly, the trial court did not err in awarding only 10 days of liquidated damages in light of its conclusion that defendant wrongfully denied DCI's requested extensions of time.

Affirmed.

As prevailing party, DCI may tax costs. MCR 7.219(A).


/s/ Donald S. Owens
/s/ Kathleen Jansen
/s/ Christopher M. Murray