COMBINED COMMUNICATIONS COR-
PORATION, INC., d/b/a KUSA–TV; Kel-
ly Hostetler; and Sharon Speegle;
Plaintiffs–Appellees and Cross–Appel-
lants,

v.

PUBLIC SERVICE COMPANY OF
COLORADO, Defendant–Appellant
and Cross–Appellee.

Nos. 92CA0062, 92CA0063 and 92CA0064.

Colorado Court of Appeals,
Div. IV.

July 1, 1993.

Byrne, Kiely & White, Thomas J. Byrne, Michael L. Poindexter, Denver, for plaintiff-appellee and cross-appellant Combined Communications Corp., Inc., d/b/a KUSA–TV.

Haddon, Morgan & Foreman, P.C., Harold A. Haddon, Saskia A. Jordon, Rachel A. Bellis, Denver, for plaintiff-appellee and cross-appellant Kelly Hostetler.

Dill, Dill & Carr, P.C., H. Alan Dill, Daniel L. Bronstein, Denver, for plaintiff-appellee and cross-appellant Sharon Speegle.

Kelly, Stansfield & O'Donnell, Timothy J. Flanagan, William L. Sasz, James R. McCotter, Denver, for defendant-appellant and cross-appellee.

Opinion by Judge CRISWELL.

A helicopter owned by plaintiff Combined Communications Corporation (KUSA) collided with electrical transmission lines owned by defendant Public Service Company of Colorado (PSC). The pilot, the husband of plaintiff Sharon Speegle, and a passenger, the husband of Karen Hostetler, were killed in the crash. Thereafter, each plaintiff filed

a separate action to recover damages for property damage and wrongful death from PSC. Pursuant to an order of a panel on multi-district litigation, the three separate actions were consolidated and assigned to the Denver District Court. At the conclusion of a jury trial, verdicts were returned in favor of all three plaintiffs, and the court entered judgments on those verdicts in the total amount of approximately $2,900,000. PSC appeals; plaintiffs have instituted a cross-appeal that they seek to press only if we determine that a new trial must be ordered. We affirm the judgments, but remand for a recalculation of the amounts of the judgments in favor of the individual plaintiffs.

## I.

PSC first argues that the panel on multi-district litigation, convened pursuant to C.R.C.P. 42.1, improperly directed that the trial of these consolidated actions take place in Denver. It maintains that C.R.C.P. 98(a) required that the trial be conducted in Park County, the county in which the transmission lines with which the helicopter collided were located. We disagree.

C.R.C.P. 98(a) requires "all actions affecting ... franchises" to be tried "in the county in which the subject of the action, or a substantial part thereof, is situated."

This provision has been interpreted to require the trial of any action affecting a utility's property or operations to be conducted in the county in which that property or the utility itself is located. *Denver v. Glendale Water & Sanitation District,* 152 Colo. 39, 380 P.2d 553 (1963) (suit to enjoin construction of utility's facilities must be brought in county in which construction is taking place).

However, a suit to obtain a money judgment against a utility is not one that affects its property or operations within the meaning of C.R.C.P. 98(a), and the mandatory venue requirements of that rule do not apply to such suits. *Cripple Creek v. Johns,* 177 Colo. 443, 494 P.2d 823 (1972).

Here, the "subject of the action" did not affect either PSC's property or its utility operations. It was a simple action for money damages for an alleged tort. Hence,

C.R.C.P. 98(c) authorized the prosecution of the action in Denver, the county in which PSC has its principal place of business and in which it was served with process.

## II.

PSC next argues that the court erred in denying its pretrial motion in limine which sought the exclusion of certain evidence. That evidence indicated that, prior to the accident upon which plaintiffs' claims are based, PSC, in consultation with various representatives of the Federal Aviation Administration (FAA), had jointly inspected a number of its lines that were 200 or more feet above the surface and, as a result, decided to mark several of those lines, including the one struck by KUSA's helicopter, with orange aviation balls. We conclude, as did the trial court, that PSC's objections to this evidence were not valid.

Before addressing PSC's specific contentions upon this point, we note that there was evidence before the trial court that an FAA regulation in effect at the time of the construction of the line in question, 14 C.F.R. § 677.13(a) (1968), required PSC to notify the FAA in writing of the proposed construction of any lines that would be more than 200 feet in height. There was testimony that, had such notification been given, a joint study would have been undertaken at that time to determine whether the line presented a hazard to aircraft. If so, the line was required to be marked with orange aviation balls.

Further, it was undisputed that, when PSC constructed the line at issue here, it gave no notice to the FAA of its proposed construction.

### A.

PSC first argues that evidence of its decision to mark the line in question, which it had not implemented as of the date of the accident here, was required to be excluded by CRE 407, which generally excludes evidence of any measure taken *"after* the event ... which if taken previously, would have made the event less likely to occur," if such

evidence is offered to prove negligence or other culpable conduct. (emphasis supplied) However, PSC's actions here were not those of the type referred to by this rule.

PSC's consultation with the FAA and its survey of a number of lines in its system were allegedly prompted by a previous lawsuit in which this court ultimately recognized that the common law imposed a duty upon PSC to mark those portions of its lines that presented a danger to aircraft if it is reasonably foreseeable that a collision might occur in the absence of such markings. *See Sewell v. Public Service Co.*, 832 P.2d 994 (Colo.App. 1991).

■ The consultation with the FAA, the survey of its lines, and the decision to mark the line here, all came *before* the accident that is the subject of this litigation. That accident, therefore, played no part in PSC's decision to mark this line. Hence, PSC's pre-accident actions could be used as admissions by it that reasonable care mandated the marking of the line without offending against either the purpose or the language of CRE 407. *See Raymond v. Raymond Corp.*, 938 F.2d 1518, 1523 (1st Cir.1991) ("Under 407, only measures which take place after the 'event' are excluded. The term 'event' refers to the accident that precipitated the suit."); *Huffman v. Caterpillar Tractor Co.*, 908 F.2d 1470, 1481–1482 (10th Cir.1990) ("[I]t is clear from the wording and history of Rule 407 that the term 'event' refers to the time of the accident or injury to the plaintiff.... Colorado cases suggest a similar understanding of the term 'event.'"). *See also Uptain v. Huntington Lab, Inc.*, 723 P.2d 1322 (Colo. 1986).

### B.

Likewise, we reject PSC's argument that the so-called "good Samaritan" statute, § 13–21–116, C.R.S. (1987 Repl.Vol. 6A), as it existed prior to its recent amendment, Colo. Sess.Laws 1992, ch. 65 at 295, precluded the introduction of the evidence complained about.

The purpose of this statute is "to encourage the provision of services or assistance by persons on a voluntary basis to enhance the public safety...." Section 13–21–116(1), C.R.S. (1987 Repl.Vol. 6A). To accomplish this purpose, it is provided that no person shall "be deemed to have assumed a duty of care *where none otherwise existed*" if (1) he performs a "service or act of assistance," (2) "without compensation or expectation" thereof, (3) "for the benefit of another person," or (4) "adopts a policy or a regulation to protect another person's health or safety." Section 13–21–116(2), C.R.S. (Repl.Vol. 6A) (emphasis supplied).

The statute is expressly inapplicable except in those instances in which it is asserted that the act of providing non-compensated services or benefits to another by a donor results in the assumption by that donor of a duty of due care when, absent such act, no such duty would otherwise exist. That is not this case.

■ Here, PSC had a common law duty to give warning of a dangerous condition created by it if it was reasonably foreseeable that a failure to give such a warning might lead to injury or damage to another. *See Sewell v. Public Service Co., supra.* The evidence complained about, therefore, was not introduced to demonstrate that PSC, because of its decision to mark this line, voluntarily assumed a duty to do so. It was admitted, rather, as tending to demonstrate that PSC had failed to perform a pre-existing legal duty of due care owed by it to the public.

### C.

PSC also argues that the admission of the evidence respecting its decision to mark the transmission line with which the helicopter collided violated what it refers to as the "self-critical analysis" privilege. We conclude that no such privilege exists with reference to the disputed evidence.

The federal rules governing the admission of evidence, Fed.R.Evid. 501, provide that any testimonial privilege "shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in light of reason and experience." The comparable state rule, CRE 501, contains a somewhat similar provision.

Pursuant to the authority of Fed.R.Evid. 501, some federal courts, commencing with *Bredice v. Doctor's Hospital, Inc.*, 50 F.R.D. 249 (D.D.C.1970), *aff'd*, 479 F.2d 920 (D.C.Cir.1973), have appeared to recognize a privilege against the disclosure of information developed or produced during the course of certain internal corporate proceedings.

However, both the nature of the proceedings giving rise to the claim of privilege and the nature of the information protected have been severely limited by the courts that have recognized such a privilege. It would appear that, thus far, such a privilege has been extended only to information given in peer reviews of university faculty or of hospital personnel, affirmative action studies, and certain internal investigatory reports. *See generally* J.F. Flanagan, *Rejecting a General Privilege for Self-Critical Analysis*, 51 Geo. Wash.L.Rev. 551 (1983); Note, *The Privilege of Self-Critical Analysis*, 96 Harv.L.Rev. 1083 (1983).

Moreover, the impetus toward recognition of any such privilege has been somewhat dampened by the unanimous opinion of the United States Supreme Court in *University of Pennsylvania v. Equal Employment Opportunity Commission*, 493 U.S. 182, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990). There, the Court concluded that the federal courts' authority under Fed.R.Evid. 501 to recognize privileges not generally recognized by the common law or created by statute should not be exercised "expansively" and held that there was no privilege against disclosure that attached to the faculty comments or decisions made during the course of a faculty peer review procedure.

■ Nevertheless, to the extent that any such privilege may be said to exist, it is a privilege against *discovery* of otherwise relevant information. We have found no instance in which information voluntarily disclosed by the claimed privilege holder, or otherwise legitimately obtained by an adversary, has been denied admission into evidence. *See Dowling v. American Hawaii Cruises, Inc.*, 971 F.2d 423 (9th Cir.1992).

■ Further, in order for the privilege to apply, it must be demonstrated that four criteria exist: The information must result from a "critical self-analysis undertaken by the parties seeking protection"; the public must have a strong interest in preserving the free flow of information respecting the subject matter; the information must be of the type that its free flow would cease if the privilege is not recognized; and, finally, any document produced as a result of this self-critical analysis must be produced in the expectation of confidentiality and it must actually have been kept confidential. *Dowling v. American Hawaii Cruises, Inc., supra.*

■ The privilege does not protect against the discovery of information developed by routine, internal corporate reviews of matters relating to safety engaged in prior to the incident upon which the litigation in which the disclosure is sought is based. This is so because, while post-accident investigations might be discouraged if no privilege were recognized, general pre-accident safety reviews:

are designed to preempt litigation; it is perverse to assume that candid assessments necessary to *prevent* accidents will be inhibited by the fear that they could later be used as a weapon in hypothetical litigation they are supposed to prevent.

*Dowling, supra*, at 427 (emphasis supplied).

■ Colorado has not, as yet, recognized any such privilege; no appellate decision has ever addressed the question of its existence. *Posey v. District Court*, 196 Colo. 396, 586 P.2d 36 (1978), relied upon by PSC, is inapposite; there, the court simply enforced a statutory privilege created by the General Assembly.

■ However, even if we assume, arguendo, that the Colorado courts would recognize a privilege similar to that created by some of the federal courts, we conclude that it would not be applicable to the evidence in controversy here.

First, a privilege would not arise with respect to the documents produced by PSC's joint review of its transmission lines with the FAA because they were not treated as confidential. They were part of the agency's public files.

Further, PSC's consultation with the FAA did not relate to the causes of any particular accident. They were, rather, related to the subject of the general safety of PSC's transmission lines to the extent that those lines were in excess of 200 feet above ground level. A privilege is not recognized in such circumstances. *Dowling v. American Hawaii Cruises, Inc., supra.*

Hence, we conclude that the trial court committed no error in denying PSC's motion in limine.

### III.

PSC also contends that the trial court erred in denying its request to cross-examine one of the plaintiffs with respect to her statement that, while she had remarried, she had continued to use her deceased husband's name. We reject this contention.

Plaintiff filed this action under her former married name, which she took when she married the decedent, but she later remarried. PSC argues that plaintiff lied in her representation to the court that, despite her subsequent remarriage, she still used her former married name at the time of trial. It argues that this allowed plaintiff to take a "false oath."

PSC does not challenge the trial court's underlying ruling that plaintiff's remarriage after her husband's death and the filing of this action was irrelevant. Rather, it argues, in effect, that its right to impeach plaintiff's credibility on cross-examination should have been allowed in spite of the irrelevancy of plaintiff's remarriage.

There is no right, however, to cross-examine on a collateral matter for impeachment or for any other purpose. *Appel v. Sentry Life Ins. Co.,* 739 P.2d 1380 (Colo.1987).

Further, the extent of permissible cross-examination is a matter within the sound discretion of the trial court. *Public Service Co. v. Barnhill,* 690 P.2d 1248 (Colo.1984); *People v. Moore,* 193 Colo. 81, 562 P.2d 749 (1977). There was no abuse of that discretion here.

### IV.

The next claimed error is the trial court's decision to excuse one juror and the first alternate juror while the trial was in progress and before deliberations had commenced. We conclude that no reversible error occurred.

One of the plaintiffs asserted that she saw a juror speaking in the hallway with a courtroom observer who was the wife of one of PSC's most important witnesses. However, there was apparent agreement that the first alternate juror would not be a suitable substitute because she had paid little attention to the trial proceedings. In an abundance of caution, therefore, the trial court dismissed both the juror who had spoken with the witness and the first alternate juror, replacing the sitting juror with the second alternate.

This case resembles *People v. Johnson,* 757 P.2d 1098 (Colo.App.1988). There, the trial court excused one juror in the midst of trial but before deliberations because the juror had indicated irritation with the length of the trial, had personal experience with the type of vandalism involved in the case, and had commented on starting deliberations before the completion of the prosecution's case. It was there held that the dismissal of a juror in such circumstances is a matter within the sound discretion of the trial court.

While there is no evidence that the short communication between the juror and the court observer in the hallway would have biased the juror, the trial court was clearly within its discretion in concluding that these circumstances presented an appearance of possible bias. It was, therefore, warranted in dismissing this juror. Likewise, we deem it within the court's discretion to replace the dismissed juror with the second alternate juror under the circumstances.

### V.

PSC next asserts that the trial court erred in rejecting its request for a mistrial because the closing argument of the attorney for one of the wrongful death plaintiffs was improperly inflammatory. We do not consider that

the trial court erred in rejecting this request for a mistrial.

■ While counsel may properly point to circumstances which raise questions or cast doubt on a witness' testimony, counsel may not throw onto the scales of credibility his or her own personal opinion. *Wilson v. People,* 743 P.2d 415 (Colo.1987).

■ Here, in asserting, on several occasions, that certain of PSC's witnesses had "lied," plaintiffs' counsel did more than comment upon these defense witnesses' credibility; he expressed his personal opinion in an impermissible manner. This was improper.

■ PSC, however, made no contemporaneous objection to this closing argument. Rather, it waited until the closing argument had been completed and then requested a mistrial. Thus, PSC's counsel must bear some responsibility for the repeated references to defense witnesses as liars. *See Freeland v. Fife,* 151 Colo. 339, 377 P.2d 942 (1963) (if party fails to make a contemporaneous objection to closing argument, objection to its propriety is waived).

The record indicates that the trial court had substantial misgivings about counsel's statements. If a contemporaneous objection had been made to the first improper comment, therefore, it seems evident that the trial court would have instructed counsel not to make any further similar statements and would have instructed the jurors to disregard the previous comment.

However, because the trial court observed the argument and the jurors' reactions to it as it occurred, whether this argument so inflamed the passions of the jurors as to require a mistrial was a matter within its sound discretion. *Weicker Transfer & Storage Co. v. Bedwell,* 95 Colo. 280, 35 P.2d 1022 (Colo.1934). Here, given the circumstances, we cannot say that there was an abuse of that discretion.

## VI.

PSC next argues that the judgment was entered upon inconsistent jury verdicts that were based upon erroneous jury instructions.

We conclude that no reversible error occurred.

The jury assigned 65% of the negligence to defendant in all three actions. However, in the pilot's case the jury divided the remaining 35% of the negligence between the pilot and KUSA, his employer; the verdict assigned all of the 35% to KUSA on its property damage claim; and, in the passenger's case, the jury assigned the full 35% to the pilot. PSC argues that these verdicts are inconsistent and that such inconsistency was caused by defective jury instructions.

■ A verdict will not be reversed for inconsistency if a reading of the record reveals any basis for the verdicts. *City of Aurora v. Loveless,* 639 P.2d 1061 (Colo. 1981). This court's task then is to examine the record to determine if there was competent evidence from which the jury could have logically returned the three verdicts in this case. If there is a view of the evidence which makes the jurors' answers consistent, we must adopt that view. *City of Aurora v. Loveless, supra.*

■ The difference in the liability assigned by the jury in each case demonstrates no material inconsistency. From the perspective of the passenger, it makes no difference whether the percentage of liability that is not assigned to PSC is assigned to the pilot or to the pilot's employer. Such negligence is not imputed to the passenger in any event. Any personal negligence of the pilot, however, might serve to defeat his widow's claim under comparative negligence principles. Thus, a differentiation between the pilot's negligence and any separate negligence of KUSA was important with respect to the claim of the pilot's widow, but not with respect to the claim of the passenger's widow. And, in both instances, the damages sustained by the plaintiffs were reduced by the full 35% of the negligence not attributable to PSC.

■ Nor was there any instructional error committed. One of the cited instructions merely explains that the damages which the passenger's widow could recover from PSC would be reduced by the amount that her

damages were found to have been caused by the negligence of others.

The other instruction explained that, consistent with Colorado's comparative negligence statute, if the pilot was found to be more than 50% negligent, this would preclude his widow from recovery, but that this would not preclude recovery by the passenger co-plaintiff. *See* § 13–21–111, C.R.S. (1987 Rep.Vol. 6A).

During their deliberations, the jurors sent a note to the judge questioning why the requests for a determination of negligence differed among the three special verdict forms. In a written response, the court again emphasized the difference between the impact of any negligence of the pilot upon the claims of the two individuals in these words:

As to Kelly Hostetler [the passenger's widow], [the pilot's] negligence, if any, would reduce her award proportionately, but if [the pilot's] negligence was 50% or greater, such negligence would not bar Kelly Hostetler from a proportionate recovery of her damages, if any.

There was no conflict among the two instructions, the judge's answer to the jurors' question upon this subject, or the verdicts returned.

### VII.

PSC also asserts that the trial court erred in awarding prejudgment interest on the wrongful death awards and on the property damage awards. We agree only in part.

#### A.

■ Loss accrues in wrongful death actions at the time of death. *See Barnhill v. Public Service Co.*, 649 P.2d 716 (Colo.App. 1982), *aff'd*, 690 P.2d 1248 (Colo.1984). Thus, the award of prejudgment interest on such damages from that time of accrual is appropriate. Section 13–21–101(1), C.R.S. (1987 Repl.Vol. 6A); *Stevens v. Humana of Delaware, Inc.*, 832 P.2d 1076 (Colo.App.1992).

■ Here, the expert witness computed the loss of the individual plaintiffs from the date of the deaths of their decedents to the

time of trial by assuming that, during that 2.8 year period, they each would have received wage increases and by adjusting their actual wages accordingly. These resulting figures were not, however, further adjusted for the loss of the use of those wages during that period by the addition of interest to those figures. *See Voight v. Colorado Mountain Club*, 819 P.2d 1088, 1093 (Colo.App. 1991) (the purpose for the award of interest is "to compensate the damaged party for the loss of the use of money").

Hence, the trial court did not err in adding prejudgment interest to the jury verdicts to compensate the individual plaintiffs for the loss of the use of that income before trial.

■ PSC is correct, however, that the trial court erred in ordering that such prejudgment interest on these two judgments must be compounded *semi-annually*. Section 13–21–101 authorizes interest to be compounded only on an annual basis.

#### B.

■ PSC further claims that interest on KUSA's judgment, calculated from the date of the accident, violates § 5–12–102, C.R.S. (1992 Repl.Vol. 2). We reject this contention.

In *Isbill Associates v. Denver*, 666 P.2d 1117, 1122 (Colo.App.1983), also a property damage case, it was held that the language of § 5–12–102, while facially unclear, was intended to provide for the award of interest "not from the time the suit was filed, not from the time the judgment was entered, but from the time they [the plaintiffs] were wronged." The court's award here, therefore, was in accord with this statute.

### VIII.

■ PSC finally argues that the trial court should have set off against the judgments entered certain payments received by both individual plaintiffs. However, this record would not support such a setoff.

Section 13–21–111.6, C.R.S. (1987 Repl.Vol. 6A) requires the trial court to set off any payment received by a tort plaintiff, or his or her estate or personal representative, which

was intended to indemnify or compensate such plaintiff "for his loss." However, it exempts from such setoff any payment made "as a result of a contract entered into and paid for by or on behalf of such person."

The "contract" referred to in this statute includes a contract of employment. Hence, if the proceeds received result from a benefit provided to the employee by his or her employer pursuant to the contract of hire, such proceeds are not subject to the statutory setoff. *Van Waters & Rogers, Inc. v. Keelan,* 840 P.2d 1070 (Colo.1992).

PSC initially asserted that the benefits received by the individual plaintiffs in the form of social security benefits, workers' compensation death benefits, and benefits from several life insurance policies, were required to be credited against the jury verdicts pursuant to this statute. However, it is clear that the social security and workers' compensation benefits were received as a result of the employees' contracts of hire. Hence, the verdicts were not subject to being set off by the amounts of these benefits, and in its most recent brief filed with this court, PSC impliedly concedes this point.

This, then, leaves only the proceeds from the life insurance policies to be considered by us. But, PSC failed to present sufficient evidence to ·allow either the trial court or this court to evaluate its claim to a setoff for these proceeds.

The only information respecting the plaintiffs' receipt of insurance proceeds was contained in attachments to one of PSC's post-trial motions. These attachments were letters from plaintiffs' counsel acknowledging plaintiffs' receipt of certain proceeds from specified life insurance policies. However, PSC made no effort to demonstrate who procured these policies or whether these policies were straight life policies or contained provisions for increased limits in the event of accidental death.

In response to PSC's motion, plaintiffs asserted (also without providing the trial court with any evidentiary materials) that the policies involved were all either procured by the plaintiffs' decedents themselves or by KUSA,

their employer. PSC did not deny this assertion.

Given the lack of evidence respecting the nature of the policies upon which PSC relies in asserting its claim to setoffs, we hold that it failed to demonstrate that any of these policies were designed to indemnify or compensate plaintiff for their loss. This record will not, therefore, allow us to determine whether the policies here fall within the statute's general purview. And, we certainly cannot determine whether they fall within that statute's exception.

The judgments of the trial court are affirmed, except that the cause is remanded to the trial court to recalculate the amount of interest to be added to the judgments in favor of the individual plaintiffs in accordance with the views set forth in this opinion.

PLANK and RULAND, JJ., concur.