Genevieve CLOUGH, as Personal Representative of William F. Clough, deceased, Plaintiff–Appellee,

v.

**WILLIAMS PRODUCTION RMT COMPANY, Defendant–Appellant.**

No. 05CA0322.

Colorado Court of Appeals, Div. I.

Feb. 8, 2007.

Certiorari Denied Sept. 11, 2007.

Dufford, Waldeck, Milburn & Krohn, L.L.P., Nathan A. Keever, Grand Junction, Colorado, for Plaintiff–Appellee.

Davis Graham & Stubbs, LLP, Anthony J. Shaheen, Eugene A. Lang, Jr., Denver, Colorado, for Defendant–Appellant.

Opinion by Judge BERNARD.

In this case involving royalty payments under natural gas leases, defendant, Williams Production RMT Company, appeals the judgment in favor of plaintiff, William F. Clough. We affirm.

## I. Background

The following facts are undisputed. Clough owns royalty interests in natural gas wells in the Piceance Basin in Garfield County, Colorado. Williams operates the wells and pays royalties pursuant to two natural gas leases. Clough sued Williams to recover unpaid royalties, claiming Williams' predecessor in interest, Barrett Resources Corporation, underpaid royalties due him by failing to account for all the gas obtained, failing to pay the full amount due for the natural gas liquids removed from the gas stream, and improperly deducting the cost of gathering, processing, and transporting the gas to the commercial marketplace from the royalty payment. Clough alleged these underpayments were a breach of the leases and a violation of the Colorado Consumer Protection Act.

The jury found Williams breached one or both of the leases and awarded Clough $4,091,561.30 in damages. The jury also found Williams violated the Consumer Protection Act and acted in bad faith.

After the verdict was returned, Clough filed a motion for trebling of damages and entry of judgment. Williams filed a motion for judgment notwithstanding the verdict and for a new trial. The trial court granted Williams' motion for judgment notwithstanding the verdict as to the Consumer Protec-

tion Act claim, denied Williams' motion for a new trial, awarded Clough prejudgment interest and costs, and denied Clough's motion to treble damages.

## II. Exclusion of Pre–1992 Sales and Marketing Evidence

Williams first contends the trial court erred in excluding evidence of an offer it received in 1984 to purchase gas at the wellhead and other pre–1992 sales and marketing evidence. Williams argues its decision to reject the offer and build its own gathering system affected its post–1992 sales and marketing decisions and the deductions it took from Clough's royalty payments. We conclude the evidence was properly excluded.

### A. Background of Natural Gas Regulation

To place Williams' contention in context, we begin by briefly reviewing the relevant history of the natural gas industry.

In 1938, Congress enacted the Natural Gas Act, 15 U.S.C. § 717, et seq., which authorized the Federal Power Commission to regulate pipeline rates for transportation and resale of natural gas. *See Smith v. Amoco Prod. Co.,* 272 Kan. 58, 31 P.3d 255 (2001). However, because the Act did not require interstate pipelines to offer transportation services to third parties wishing to ship gas, "interstate pipelines [were able] to use their monopoly power over gas transportation to create and maintain monopoly power in the market for the purchase of gas at the wellhead and monopsony power in the market for the sale of gas to [local distribution companies]." Richard J. Pierce, Jr., *The Evolution of Natural Gas Regulatory Policy,* 10 Nat. Resources & Env't 53, 53–54 (Summer 1995) (quoted in *Gen. Motors Corp. v. Tracy,* 519 U.S. 278, 283, 117 S.Ct. 811, 816, 136 L.Ed.2d 761 (1997)) ("monopsony" is defined as "a market situation in which there is a single buyer for a given product or service from a large number of sellers," *Webster's Third New International Dictionary* 1463 (1976)).

Congress took a first step toward increasing competition in the natural gas market by enacting the Natural Gas Policy Act of 1978, 15 U.S.C. § 3301, et seq., which was designed to phase out regulation of wellhead prices

charged by producers of natural gas, and to promote gas transportation by interstate and intrastate pipelines for third parties. *See generally* Pipeline Service Obligations and Revisions to Regulations Governing Self–Implementing Transportation; and Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol, 57 Fed.Reg. 13267, 13271 (Apr. 16, 1992) (codified at 18 C.F.R. pt. 284) (reviewing history of decontrol). Pipelines were reluctant to provide common carriage, however, when doing so would displace their own sales. *See Associated Gas Distribs. v. Fed. Energy Regulatory Comm'n,* 824 F.2d 981 (D.C.Cir.1987).

Thus, in 1985, the Federal Energy Regulatory Commission (FERC) promulgated Order No. 436, which contained an "open access" rule providing incentives for pipelines to offer gas transportation services. *See* Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol, 50 Fed.Reg. 42408 (Oct. 18, 1985) (codified at 18 C.F.R. pts. 2, 157, 250, 284, 375 & 381); *Gen. Motors Corp. v. Tracy, supra.*

In 1992, this evolution culminated in FERC's Order No. 636, which required all interstate pipelines to "unbundle" transportation services from their own natural gas sales and to provide common carriage services to buyers from other sources that wished to ship gas. *See* Pipeline Service Obligations, *supra; Gen. Motors Corp. v. Tracy, supra.* This implementing regulation dramatically changed the natural gas industry, because pipeline companies were "no longer permitted … to act as traditional merchants—buying gas at the wellhead and reselling the gas downstream—producers had to now market the gas themselves." Joyce Colson, *Upstream, Midstream, Downstream—The Valuation of Royalties on Federal Oil and Gas Leases,* 70 U. Colo. L.Rev. 563, 593 (Spring 1999); *see Indep. Petroleum Ass'n v. DeWitt,* 279 F.3d 1036 (D.C.Cir.2002) (noting the industry change); *Office of Util. Consumer Counselor v. Bd. of Dirs.,* 678 N.E.2d 1127 (Ind.Ct.App.1997)(same); *In re ANR Pipeline Co.,* 276 Kan. 702, 79 P.3d 751 (2003) (same); *Colo. Interstate Gas Co. v. Wyo. Dep't of Revenue,* 20 P.3d 528 (Wyo. 2001)(same).

The deregulation of the natural gas industry is considered the major catalyst for the current wave of royalty litigation because, before deregulation, buyers purchased gas at or near the wellhead, thereby absorbing most post-wellhead costs. Now, most gas is purchased away from the wellhead. *See* Owen L. Anderson, *Royalty Valuation: Should Royalty Obligations Be Determined Intrinsically, Theoretically, or Realistically? (Part 1)*, 37 Nat. Resources J. 547 (Summer 1997). Generally, post-wellhead processing costs include gathering, dehydration, compression, and transportation costs. *Creson v. Amoco Prod. Co.*, 129 N.M. 529, 10 P.3d 853 (Ct.App.2000); *Mittelstaedt v. Santa Fe Minerals, Inc.*, 954 P.2d 1203 (Okla.1998).

### B. Implied Covenant to Market

The industry shift is evident in *Rogers v. Westerman Farm Co.*, 29 P.3d 887 (Colo. 2001), in which the leases at issue executed in the 1970s provided for the gas to be sold "at the wellhead," with the buyer undertaking the performance of the gathering, compression, and dehydration necessary for the gas to enter the pipeline. However, leases amended in the late 1980s and early 1990s provided for sale of the gas away from the well.

Against the background of the changing natural gas industry, the supreme court in *Rogers* was called upon to decide whether certain natural gas leases provided for the allocation of post-wellhead costs between the working interest owner and the royalty interest owner. All the leases contemplated that royalties were to be computed "at the well" or "at the mouth of the well." Although the court recognized other jurisdictions had ruled "at the well" language is sufficient to provide for sharing of post-wellhead costs, *see Schroeder v. Terra Energy, Ltd.*, 223 Mich.App. 176, 565 N.W.2d 887 (1997); *Judice v. Mewbourne Oil Co.*, 939 S.W.2d 133 (Tex.1996), it declined to follow them and concluded the leases were silent on the allocation of post-wellhead costs. *Rogers v. Westerman Farm Co.*, supra, 29 P.3d at 901.

The court in *Rogers* turned to its earlier decision in *Garman v. Conoco, Inc.*, 886 P.2d 652 (Colo.1994), which held that the duty to market is a covenant implied in every oil and gas lease, and where an oil and gas lease is silent on the allocation of post-wellhead costs, the implied covenant to market must be considered in determining the rights of the working interest owner and royalty interest owner. Thus, the court in *Garman* concluded, "[T] he implied covenant to market obligates the lessee [working interest owner] to incur those post-production costs necessary to place gas in a condition acceptable for market. Overriding royalty interest owners are not obligated to share in these costs." *Garman v. Conoco, Inc.*, supra, 886 P.2d at 659.

The supreme court did not define marketable condition in *Garman*, but it did so in *Rogers* by stating: "[T]he theory of the first-marketable product is helpful in guiding our definition of marketability, and what is meant by gas being in a marketable condition. Thus ... we look to the first-marketable product rule for guidance, but do not adopt it in its entirety." *Rogers v. Westerman Farm Co.*, supra, 29 P.3d at 904. The first-marketable product rule states, "[T]he point where a marketable product is first obtained is the logical point where the exploration and production segment of the oil and gas industry ends, is the point where the primary objective of the lease contract is achieved, and therefore is the logical point for the calculation of royalty." *Rogers v. Westerman Farm Co.*, supra, 29 P.3d at 904 (quoting Owen L. Anderson, *Royalty Valuation: Should Royalty Obligations Be Determined Intrinsically, Theoretically, or Realistically? (Part 2)*, 37 Nat. Resources J. 611, 637 (Summer 1997)).

Based on the first-marketable product rule, the court set forth this definition of marketability: gas is marketable when it is (1) in the physical condition where it is acceptable to be bought and sold in a commercial marketplace and (2) in the location of a commercial marketplace. *Rogers v. Westerman Farm Co.*, supra, 29 P.3d at 905; *accord Savage v. Williams Prod. RMT Co.*, 140 P.3d 67 (Colo.App.2005).

■ Once gas is marketable, the supreme court concluded, the allocation of costs be-

tween the working interest owner and the royalty interest owner can be determined. The working interest owner must bear the costs of getting the gas to a marketable condition and marketable location, but once the gas is marketable, additional costs to improve or transport the gas must be shared proportionately between the working interest owner and the royalty interest owner. *Rogers v. Westerman Farm Co., supra.*

### C. Application to This Case

■ Here, Clough alleged Williams improperly deducted the costs of gathering, processing, and transporting the gas to the commercial marketplace from February 1996 to February 2004. To justify its deductions for these costs, Williams had the burden of proving (1) the gas was marketable at the wellhead at that time; (2) the costs were reasonable; and (3) the royalty payments increased proportionately to the costs assessed against the royalties. *See Rogers v. Westerman Farm Co., supra.* Thus, when and where the gas was marketable is critical to resolving the issues before us.

### D. Relevance of Pre–1992 Sales and Marketing

We agree with the trial court the pre–1992 evidence was too dissimilar and too remote to be relevant to Clough's claims regarding royalties paid from 1996 to 2004.

■ Evidence is relevant when it has any tendency to make a fact of consequence more probable or less probable than it would be without the evidence. CRE 401. A trial court's decision to admit or exclude evidence will not be overturned on appeal absent a showing the court abused its discretion. *Scott v. Matlack, Inc.,* 39 P.3d 1160 (Colo. 2002).

The statute of limitations on an action to recover unpaid royalties on the sale of natural gas is six years. Section 13–80–103.5(1)(a), C.R.S.2006; *Patterson v. BP Am. Prod. Co.,* 159 P.3d 634 (Colo.App. 2006). The parties agree the claim for past royalty payments only concerns Williams' payments to Clough dating back to February 1996.

At trial, Williams sought to introduce evidence that when deregulation of the natural gas industry occurred in 1992, its predecessor in interest, Barrett, was in a favorable position because it had built a gathering system that enabled it to sell and market gas away from the wellhead. Williams sought to explain that Barrett had received an offer to buy gas at the wellhead in 1984, but had rejected the offer and chose instead to build its own gathering system because it foresaw deregulation of the industry.

■ Williams challenges the trial court's exclusion of evidence of pre–1992 sales and marketing. Williams submits *Rogers* stands for the proposition the first-marketable product rule determines the point of marketability and the allocation of costs. Williams argues that, by excluding evidence of pre–1992 sales and marketing, the trial court prevented it from establishing when and where the gas was first marketable. We are not persuaded.

In disallowing Williams' evidence, the trial court reasoned:

> Because of the profound changes in how gas is marketed after the 1992 FERC Order, the Court concludes that the marketing of gas before the Order is not relevant to the marketing of gas at the times for which [Clough] seeks financial recompense. The pre–1992 FERC Order sales are too remote in time. They took place in a different kind of market when the pipeline companies performed different functions and were governed by a different set of economic regulations on what they could do and how they could do it. The issues in this case simply do not relate to pre-FERC Order sales, and those sales will not shed light on the marketability issues delineated by *Rogers.* Thus, the sales before the 1992 FERC Order are not relevant under CRE 402.

The trial court permitted Williams to introduce substantial evidence concerning the history and development of the Piceance Basin and Barrett's forward-thinking and highly profitable decision to build its own gathering system before the onset of deregulation. Based upon this evidence, Williams was able to argue the market for the gas was at the

wellhead, and, in an instruction, the jury was informed of this argument.

Clough also presented evidence the gas was not marketable at the wellhead, and there was testimony the gas had to be treated at processing plants before it could be sold on the market. There was also testimony that, although the Piceance Basin was a large source of natural gas, it was not adjacent to a commercial marketplace and not in an area where there was a high demand for natural gas.

■ Williams' argument assumes that, if gas is marketable at a certain time and place, it is necessarily marketable at all points thereafter. However, whether gas is marketable is a question of fact, and the determination of when gas is marketable is driven by the commercial realties of the marketplace. *Rogers v. Westerman Farm Co., supra.*

As explained above, the commercial realities of the natural gas marketplace today are very different from those prior to deregulation of the industry. FERC's Order No. 636 was designed to effect a sea change:

> [E]fficiency in the now national gas market can be realized only when the purchasers of a commodity know, in a timely manner, the prices of the distinct elements associated with the full range of services needed to purchase and then deliver gas from the wellhead to the burnertip. Only then will gas purchasers be able to purchase, based upon their needs, the exact services they want with full recognition of the prices they would have to pay. And only then will [FERC] be assured that all gas is transported to the market place on fair terms. What best serves the interests of gas purchasers—the ability to make informed choices—is also important for gas sellers. Nonpipeline sellers also need to know the prices of the distinct elements of pipeline services in order to price their product and to decide the exact pipeline services needed to bring their gas to market. This rule provides both gas purchasers and gas sellers with the ability to make the necessary informed choices.

Pipeline Service Obligations, *supra,* 57 Fed. Reg. at 13269.

In light of this extensive change to the natural gas industry, we conclude evidence of acts taken before Order No. 636 was issued would have had little relevance in determining whether gas was marketable during the period at issue in this case. Williams fails to demonstrate how evidence of an offer to purchase gas at the wellhead before deregulation is relevant to the marketability of gas after deregulation, particularly in light of *Rogers's* holding that gas is not marketable until it is in the location of a commercial marketplace.

We therefore conclude the trial court did not abuse its discretion in excluding evidence of the 1984 offer to purchase gas at the wellhead.

We next address Williams' specific contentions regarding the exclusion of evidence of pre–1992 sales and marketability.

### 1. Critical Facts

Williams contends the trial court precluded one of its witnesses from fully answering the question of what percentage of gas entering Williams' system could be sold at the wellhead before deregulation. The record reveals otherwise. The witness responded, "I truly believe that you could have sold 100 percent of the gas supply at the wellhead, [but] you would have had to take [an] extreme cut in price to accomplish such."

Williams also contends the trial court prevented it from following up on a series of questions with Clough on cross-examination. Again, Williams fails to explain how expansion of its cross-examination related to the marketability of gas after deregulation. It is undisputed the gathering system Barrett built in the 1980s was highly profitable, and the jury heard substantial evidence on this subject. We conclude Barrett's rejection of an offer to purchase gas at the wellhead in 1984, before deregulation, is not relevant to the issue of whether the gas was marketable at the wellhead in 1996.

### 2. Remoteness in Time

Williams further contends the trial court abused its discretion by excluding evidence of

the 1984 offer as too remote in time. Again, we disagree.

■ Generally, remoteness in time affects only the weight to be given evidence, not its admissibility. *People v. Trefethen,* 751 P.2d 657 (Colo.App.1987). But whether evidence is too remote to be relevant is within the trial court's discretion. *Wilkinson v. People,* 170 Colo. 336, 460 P.2d 774 (1969). In this case, the record supports the trial court's conclusion the 1984 offer was too remote to be relevant.

### 3. Williams' Corporate Officers' State of Mind

Williams contends the state of mind of its corporate officers was at issue and therefore, it should have been permitted to offer testimony about the 1984 offer to explain its intent through the entire course of conduct. We disagree.

Williams relies on authority indicating that when a case involves allegations of bad faith, the evidence may include all the facts and circumstances which explain the party's acts and intentions. *See Dale v. Guar. Nat'l Ins. Co.,* 948 P.2d 545 (Colo.1997) (tort of bad faith breach of an insurance contract encompasses an entire course of conduct); *McCaffrey v. Mitchell,* 98 Colo. 467, 474, 56 P.2d 926, 929 (1936) (discussing the parol evidence rule: "When a party is charged with the commission of an act with a particular intent, he may testify what his intention was . . . ."); *Clay v. Ferrellgas, Inc.,* 118 N.M. 266, 881 P.2d 11 (1994)(actions of company's employees should have been viewed in the aggregate to determine whether company had requisite culpable mental state to warrant imposition of punitive damages).

However, the trial court's exclusion of the 1984 offer did not prevent Williams from explaining its intent in taking deductions from Clough's royalty payments. Williams' counsel questioned John Keller, the head of Barrett's marketing department, as follows:

> [DEFENSE ATTORNEY]: Why did Barrett think it was entitled to take those deductions for gathering, transportation, and the like that the jury has heard about so far?

> [KELLER]: Well, it was a cost that we had spent a great deal of money building the gathering system. We had alternatives that we could have had others build the gathering system, but we built the gathering system, and we felt that we had spent a considerable—several million dollars on the system itself, and it was part of getting the gas to the market. . . .

Keller expressed his opinion that taking deductions from royalty payments for gathering, transportation, compression, and dehydration of the gas was customary in the natural gas industry.

Accordingly, we conclude the trial court's ruling did not preclude Williams from presenting evidence of its intent.

### 4. Adverse Inferences

■ Williams contends Clough improperly exploited the excluded evidence in his closing argument by stating Williams knew it should not have taken the deductions, and pointing out Williams' lack of evidence on the reasonableness of those deductions. Williams relies on *State v. Dudley,* 104 Idaho 849, 664 P.2d 277 (Ct.App.1983), for the proposition that it is inappropriate to draw inferences from evidence struck from the record. We are not persuaded.

■ Williams did not object to Clough's closing argument on this issue. If a party does not timely object to an allegedly improper statement during closing argument, any later objection is waived. *Freeland v. Fife,* 151 Colo. 339, 377 P.2d 942 (1963); *accord Klein v. State Farm Mut. Auto. Ins. Co.,* 948 P.2d 43 (Colo.App.1997); *Combined Commc'ns Corp. v. Pub. Serv. Co.,* 865 P.2d 893 (Colo.App.1993); *Anderson v. Dunton Mgmt. Co.,* 865 P.2d 887 (Colo.App.1993); *Cruz v. Union Pac. R.R.,* 707 P.2d 360 (Colo. App.1985).

### 5. Reasonableness of Deductions

Williams contends the exclusion of pre–1992 sales and marketing evidence prevented it from meeting its burden of proving the deductions it took were reasonable. Williams claims it was prevented from putting on evidence about the risk it took in

building the gathering system and the amount others would have charged for doing so. However, we perceive nothing in the trial court's ruling that would have prevented Williams from putting on such evidence. In fact, Williams presented evidence about its unique decision to build the gathering system and about the method by which it calculated the deductions.

### E. Confusion of the Issues and Discovery Disclosures

Because we have concluded the trial court did not abuse its discretion by excluding as irrelevant evidence of pre–1992 sales and marketing, we need not address the other grounds relied upon by the trial court to exclude this evidence.

### III. Jury Instructions

We perceive no grounds for reversal in Williams' arguments concerning the jury instructions on good faith and fair dealing, silence of a lease as to costs, strict construction against the lessee, and modification by division order.

### A. Good Faith and Fair Dealing

■ Williams contends the jury instructions improperly emphasized Clough's claim of bad faith over other causes of action and consequently misled the jury. According to Williams, the trial court improperly combined the issues of marketability and breach of contract with the separate issue of bad faith, in violation of principles expressed in *Rogers*. We disagree.

■ Generally, it is within the trial court's discretion to determine the form and style of jury instructions, and an appellate court will not overturn the trial court's decision absent an abuse of discretion. *Williams v. Chrysler Ins. Co.*, 928 P.2d 1375 (Colo.App. 1996). However, an instruction that confuses or misleads the jury is erroneous. *States v. R.D. Werner Co.*, 799 P.2d 427 (Colo.App. 1990).

■ An improper jury instruction is not grounds for reversal unless it prejudices a party's substantial rights. *Phillips v. Monarch Recreation Corp.*, 668 P.2d 982 (Colo.

App.1983). A party's substantial rights are prejudiced where the record shows the jury might have returned a different verdict had a proper instruction been given. *Webb v. Dessert Seed Co.*, 718 P.2d 1057 (Colo.1986).

In *Rogers*, the supreme court held that whether a lessee acted in bad faith is a separate issue from the determination of marketability for the purpose of allocating costs and calculating royalty payments. The court explained:

> An analysis of marketability allows for a determination of the proper allocation of costs, and thus, defines the calculation of royalty payments. In contrast, the bad faith of a lessee implicates the sale price of certain gas, either for less than it was worth, or to a related party for an artificially low price.

*Rogers v. Westerman Farm Co., supra*, 29 P.3d at 908. Thus, the court concluded, where bad faith of a lessee is at issue, it should be addressed and instructed upon separately from the issue of whether the gas is marketable.

In this case, Clough propounded three theories of breach of contract: (1) Barrett failed to account for all the gas obtained; (2) Barrett failed to pay the full amount due for the natural gas liquids removed from the gas stream; and (3) Barrett improperly deducted from the royalty payments the costs of gathering, processing, and transporting the gas to the commercial marketplace.

The trial court gave separate instructions on bad faith and marketability, but the marketability instructions addressed only the third theory. Thus, a separate bad faith instruction was necessary to address Clough's other theories and the substantial testimony at trial that Barrett intentionally undervalued the gas in calculating Clough's royalties. Therefore, we conclude the trial court's instructions were consistent with the requisites of *Rogers*, did not elevate bad faith over Clough's other theories of breach of the leases, and did not mislead the jury.

### B. Silence on Costs

■ Williams contends the trial court abused its discretion by refusing its tendered

instruction that the leases were silent on the allocation of costs. We disagree.

■■■■ An otherwise correct judgment will not be reversed for a trial court's refusal to give a requested instruction where there is no substantial, prejudicial error. *Armentrout v. FMC Corp.*, 842 P.2d 175 (Colo.1992). Moreover, it is not reversible error to refuse a requested instruction if its contents are already encompassed in other instructions given to the jury. *Underwood v. Dillon Cos.*, 936 P.2d 612 (Colo.App.1997); *Woolsey v. Holiday Health Clubs & Fitness Ctrs., Inc.*, 820 P.2d 1201 (Colo.App.1991).

Here, the trial court ruled Williams' separate instruction concerning the leases being silent about the allocation of costs was unnecessary and had the capacity to mislead the jury, because the other instructions covered any problems the silence instruction was intended to solve. We conclude the trial court did not abuse its discretion.

In *Rogers*, the supreme court determined, as a matter of law, that the phrase "at the well" was silent with respect to how royalties should be calculated. Thus, there was no need to instruct the jury the leases were silent because that issue had already been resolved as a matter of law.

Here, the jury was given all the necessary instructions, including an explanation of the implied duty to market gas; the working interest owner's obligations under this implied duty; the definition of a market; the test for marketability; and the working interest owner's entitlement to take deductions from royalties for costs incurred after the gas has become marketable.

Williams nevertheless argues it was prejudiced by the lack of a silence instruction because, without it, the jury was confused and led to believe there was lease language addressing deductions. We are not persuaded.

Shortly after the jury began deliberating, it asked to see the leases and requested instruction on Colorado law pertaining to deductions. The leases had been admitted as exhibits and were provided to the jury.

The trial court answered the jury's question concerning the law of deductions by replying that all the applicable law had been given to the jury. Neither party objected to the trial court's response, and the jury did not ask any follow-up questions regarding the marketability instructions. Accordingly, we conclude the jury had sufficient instructions to render its verdict. *See Leonardo v. People*, 728 P.2d 1252 (Colo.1986)(absent a contrary showing, it is presumed the jury understood and followed the trial court's instructions). Here, we conclude the jury's question provided no reason to infer it was confused by the lack of a silence instruction.

Williams argues the prejudice caused by the lack of a silence instruction was compounded by the instruction that the leases were to be strictly construed against it. According to Williams, this instruction implied the parties disputed language in the leases, when no such dispute existed.

Williams also argues the instruction concerning documents called division orders, which had been signed by Clough, was improperly given. A division order is a contract of sale to the purchaser of oil or gas. The division order directs the purchaser to make payment to the various interest owners for the value of the products taken in the proportions set out in the division order. H. Williams & C. Meyers, *Manual of Oil and Gas Terms* § 258 (6th ed.1984).

The instruction in question said the division orders could not amend or modify the leases. Williams contends this instruction unfairly implied Williams was trying to modify language in the leases, when Williams in fact did not try to change this language.

We disagree these additional instructions carried the implications Williams perceives. *See Rogers v. Westerman Farm Co., supra*, 29 P.3d at 901 ("[W]e are mindful of the generally accepted rule that oil and gas leases are strictly construed against the lessee in favor of the lessor."). We further conclude their inclusion was of no consequence, because Williams told the jury in its closing argument the leases were silent on the allocation of costs and, in reference to the division orders, that no language in the leases was being modified.

Hence, the trial court did not err in refusing to instruct the jury the leases were silent on the allocation of costs, and Williams was not prejudiced by the lack of such an instruction.

## IV. Damages

Williams contends the damages awarded to Clough for underpayment of royalties were speculative, because the alleged underpayments spanned February 1996 to February 2004, but Clough's expert witness based her opinion of the amount of damages on analysis of data from February 1996 to December 1999. The expert then projected her calculations onto the remainder of the time period. We perceive no grounds for reversal.

■■■■ In a breach of contract action, a plaintiff may recover the amount of damages required to place the plaintiff in the same position the plaintiff would have occupied had the breach not occurred. Damages are not recoverable for losses beyond an amount the plaintiff can establish with reasonable certainty by a preponderance of evidence. *Pomeranz v. McDonald's Corp.*, 843 P.2d 1378 (Colo.1993).

■■■■ The measure of damages for breach of contract is the same for oil and gas leases as it is for other contracts. *Petroleum Energy, Inc. v. Mid–America Petroleum, Inc.*, 775 F.Supp. 1420 (D.Kan.1991); Joseph M. Perillo, *Corbin on Contracts* § 56.23 (rev. ed.2005). Thus, a party injured by a breach of such a contract is entitled to recover all damages, including gains denied as well as losses sustained, provided they are reasonably certain and follow from the breach of contract. *Petroleum Energy, Inc. v. Mid–America Petroleum, Inc.*, supra; *see also* Richard A. Lord, *Williston on Contracts* § 66:91 (4th ed.2002) (an action for damages will normally lie in favor of the lessor when the lessee breaches a material express provision of an oil or gas lease, or an implied covenant of such a lease, provided the lessor shows that it has sustained a measurable injury, and the damages sustained are not too speculative to be ascertained with any degree of accuracy).

■■■■ In proving the amount of damages, a plaintiff need only provide "[a] reasonable basis for computation and the best evidence obtainable under the circumstances of the case which will enable the trier of the facts to arrive at a fairly approximate estimate of the loss." *Tull v. Gundersons, Inc.*, 709 P.2d 940, 945 (Colo.1985) (quoting *A to Z Rental, Inc. v. Wilson*, 413 F.2d 899, 908 (10th Cir.1969)). The plaintiff will not be barred from recovery for failing to prove the amount of loss with mathematical certainty. *W. Cities Broad., Inc. v. Schueller*, 849 P.2d 44 (Colo.1993); *Pomeranz v. McDonald's Corp.*, supra.

■■■■ Loss involving royalties is, by its nature, difficult to show. *Strata Prod. Co. v. Mercury Exploration Co.*, 121 N.M. 622, 916 P.2d 822 (1996); *County Mgmt., Inc. v. Butler*, 650 S.W.2d 888 (Tex.App.1983). When the precise amount of damages is difficult to determine, sampling is an acceptable method of calculating damages. *See Compagnie de Navigation Fraissinet & Cyprien Fabre v. Mondial United Corp.*, 316 F.2d 163, 171 (5th Cir.1963) (using a representative sample to calculate damages to cargo); *Amstar Corp. v. M/V Alexandros T.*, 472 F.Supp. 1289, 1298 (D.Md.1979) ("So long as a reasonably representative sample has been taken and so long as the sample is sufficient to indicate fairly the quality, condition and nature of damage to the whole cargo, a sampling method will be upheld as a reasonable basis for projecting damages."), *aff'd*, 664 F.2d 904 (4th Cir. 1981); *see also Blue Cross & Blue Shield, Inc. v. Philip Morris, Inc.*, 113 F.Supp.2d 345 (E.D.N.Y.2000) (using statistics and sampling to determine aggregate damages in a class action); *Bell v. Farmers Ins. Exch.*, 115 Cal.App.4th 715, 9 Cal.Rptr.3d 544 (2004)(same).

■■■■ In this case, the record contains over 300 pages of testimony from Clough's expert witness on the amount of damages. The expert testified it was customary in the oil and gas industry to use sampling in calculating damages for underpayment of royalties, because of the many variables that enter into the analysis and the number of documents that must be consulted. The expert used a forty-four-month sample, which she testified was larger than most, and considered over

450,000 documents in arriving at her conclusions, which she explained in great detail.

The expert calculated damages for underreported natural gas liquids and underreported production by comparing Williams' internal documents to documents given to the royalty owners to determine an average percent underpayment. She then multiplied the average percent underpayment by the total amount of Clough's royalty income for the relevant period.

Williams argues the data showed the amount of underpayment began to decrease in 1999 and therefore the expert's sample was not representative of the entire period. However, the expert "spot-checked" her calculations from February 1996 to December 1999 with data from August 2001, and noted the federal government audit of Barrett and Williams found the companies had underreported volumes of natural gas produced in the years 1995, 1998, 2000, 2001, and 2003.

Williams cross-examined the expert extensively on the sample size she used, drawing out other weaknesses in her testing, challenging her assumptions, and pointing out minor mathematical errors in her calculations. The jury heard this testimony, and it was responsible for weighing it in determining the amount of damages.

In denying Williams' motion for a new trial on damages, the trial court explained:

> The damages testimony was lengthy and complex, and it presented sufficient factual basis to allow the jury to find the fact of damage and a reasonable basis for computing the amount of damages. *Pomeranz v. McDonald's Corp., [supra].* The sampling period used by [Clough's] damages expert was a reasonable one under the complicated financial picture presented.

We concur with the trial court and conclude there was a sufficient basis for the jury's award of damages.

The judgment is affirmed.

Judge MÁRQUEZ and Judge ROTHENBERG concur.